# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PHILLIP TORETTO, DANIEL C. KING, and SHERI BRAUN, individually and on behalf of all others similarly situated,<br><br>   Plaintiffs,<br><br>   v.<br><br>DONNELLEY FINANCIAL SOLUTIONS, INC. and MEDIANT COMMUNICATIONS, INC., individually and as general partners,<br><br>   Defendants. | Case No. 1:20-cv-02667-GHW |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT PURSUANT TO RULE 23(e)

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

SUMMARY OF THE LITIGATION ................................................................................... 2

I.      Factual Background ................................................................................................ 2

II.     Procedural History ................................................................................................. 3

        A.      Litigation History ...................................................................................... 3

        B.      Settlement Negotiations ............................................................................. 6

SUMMARY OF PROPOSED SETTLEMENT AGREEMENT ....................................... 7

I.      The Settlement Class .............................................................................................. 7

II.     The Settlement Benefits ......................................................................................... 7

        A.      Uncapped Cash Benefits ........................................................................... 7

                1.      Reimbursement of Out-of-Pocket Losses ..................................... 8

                2.      Reimbursement for Lost Time ....................................................... 9

                3.      Claims Process ............................................................................ 10

        B.      Three-Bureau Credit Monitoring Services ............................................. 10

        C.      Business Practice Changes ...................................................................... 12

        D.      Attorneys' Fees and Expenses and Service Awards ............................... 12

        E.      Expenses for Settlement Administration ................................................. 13

        F.      Proposed Notice and Claims process ...................................................... 13

        G.      Proposed Releases ................................................................................... 15

III.    Issuing Notice of the Proposed Settlement to the Class is Justified. ................... 15

        A.      Standard for Issuance of Notice .............................................................. 15

B.      The Proposed Settlement Is Fair, Reasonable, and Adequate Pursuant to the Rule 23(e) and Second Circuit Factors. ........................................................................... 17

1.      The Class Representatives and Class Counsel Have Provided Excellent Representation to the Class. ....................................................................... 17

2.      The Settlement was Negotiated at Arm's Length. .................................... 19

3.      The Relief Provided for the Class is Adequate. ....................................... 19

i.      the costs, risks, and delay of trial and appeal; .............................. 20

ii.     the effectiveness of any proposed method of distributing relief to the class; .................................................................................... 22

iii.    the terms of the proposed award of attorney's fees; .................... 24

iv.     and any agreement required to be identified under Rule 23(e)(3). 24

4.      The Settlement Treats Class Members Equitably Relative to Each Other. .................................................................................................... 25

5.      The Ability of the Defendant to Withstand a Greater Judgment. ............ 25

6.      Recovery Under the Settlement Is Within a Reasonable Range in Light of the Best Possible Recovery and All the Attendant Risks of Litigation. ... 26

IV.     The Proposed Settlement Class Meets the Requirements for Certification. ..................... 27

A.      The Rule 23(a) Requirements Are Satisfied. ........................................................ 28

B.      The Rule 23(b)(3) Requirements Are Satisfied. ................................................... 31

V.      The Court Should Designate Interim Class Counsel ........................................................ 33

VI.     The Court Should Approve The Notice Plan, Notices, and Claim Form, and Appoint the Settlement Administrator. ................................................................................................. 33

CONCLUSION ........................................................................................................................... 35

CERTIFICATE OF SERVICE ................................................................................................... 36

APPENDIX A – TIMELINE OF SETTLEMENT EVENTS ......................................................... 1

## **TABLE OF AUTHORITIES**

**Cases**

*Abubaker v. Dominion Dental USA, Inc.*,
    No. 1:19-cv-01050, 2021 WL 6750844 (E.D. Va. Nov. 19, 2021) ...................... 27, 29, 30, 32

*Amchem Prods. Inc. v. Windsor*,
    521 U.S. 591 (1997)................................................................................... 27, 30, 31

*Anthem, Inc. Data Breach Litig.*,
    327 F.R.D. 299 (N.D. Cal. 2018)................................................................... passim

*Banyai v. Mazur*,
    No. 00 Civ. 9806, 2007 WL 927583 (S.D.N.Y. Mar. 27, 2007) ............................ 21

*Braun v. Mediant Commc'ns, Inc.*,
    No. 19-62563-CIV, 2020 WL 5038780 (S.D. Fla. Apr. 14, 2020)............................ 4

*Charron v. Pinnacle Group N.Y. LLC*,
    874 F. Supp. 2d 179 (S.D.N.Y. 2012)............................................................. 26, 33

*City of Detroit v. Grinnell Corp.*,
    495 F.2d  (2d Cir. 1974)............................................................................. 16, 25

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007).............................................................................. 17

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d Cir. 2001)............................................................................. 17

*Hammond v. The Bank of New York Mellon Corp.*,
    No. 08-cv-6060, 2010 WL 2643307 (S.D.N.Y. June 25, 2010) ................................ 5

*Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*,
    No. 1:16-c-03025, 2019 WL 3183651 (D. Md. July 15, 2019) ............................... 27

*In re Am. Bank Note Holographics, Inc.*,
    127 F. Supp. 2d 418 (S.D.N.Y. 2001).................................................................. 16

*In re AOL Time Warner S'holder Derivative Litig.*,
    No. 02 Civ. 6302, 2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006) ....................... 17, 19

*In re Austrian & German Bank Holocaust Litig.*,
    80 F. Supp. 2d 164 (S.D.N.Y. 2000)............................................................ 18, 20, 22

*In re Equifax Inc. Customer Data Sec. Litig.*,
    999 F.3d 1247 (11th Cir. 2021) ..................................................................... 30

*In re Equifax Inc. Customer Data Security Breach Litig.*,
    No. 1:17-md-2800, 2020 WL 256132 (N.D. Ga. Mar. 17, 2020)..................................... passim

*In re Facebook, Inc., IPO Sec. and Derivative Litig.*,
    343 F. Supp. 3d 394 (S.D.N.Y. 2018)............................................................... 27

*In re Global Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ..................................................................... 18

*In re GSE Bonds Antitrust Litig.*,
    414 F. Supp. 3d 686 (S.D.N.Y. 2019)............................................................. passim

*In re Initial Public Offering Sec. Litig.*,
    260 F.R.D. 81 (S.D.N.Y. 2009) ....................................................................... 31

*In re Lloyd's Am. Trust Fund Litig.*,
    No. 96 Civ. 1262, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) ........................................... 15

*In re Marsh ERISA Litig.*,
    265 F.R.D. 128 (S.D.N.Y. 2010) ..................................................................... 21

*In re Oxford Health Plans*,
    191 F.R.D. 369 (S.D.N.Y. 2000) ................................................................. 29, 30

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    330 F.R.D. 11 (E.D.N.Y. 2019) ............................................................. 16, 19, 26

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
    584 F.Supp.2d 697 (M.D. Pa. 2008) ................................................................. 25

*In re SunEdison, Inc. Sec. Litig.*,
    329 F.R.D. 124 (S.D.N.Y. 2019) ..................................................................... 28

*In re Target Corp. Customer Data Sec. Breach Litig.*,
    892 F.3d 968 (8th Cir. 2018) ......................................................................... 27

*In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*,
    No. 14-md-02583, 2016 WL 6902351 (N.D. Ga. Aug. 23, 2016)..................................... 27, 30

*Lizondro-Garcia v. Kefi LLC*,
    300 F.R.D. 169 (S.D.N.Y. 2014) ..................................................................... 16

*Marisol A. v. Giuliani*,
   126 F.3d 372 (2d Cir. 1997)............................................................................................ 29

*McMorris v. Carlos Lopez & Assocs.*, LLC,
   995 F.3d 295 (2d Cir. 2021).................................................................................... 6, 20

*Moore v. PaineWebber, Inc.*,
   306 F.3d 1247 (2d Cir. 2002)........................................................................................ 31

*Pennsylvania v. Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*,
   772 F.3d 111 (2d Cir. 2014).......................................................................................... 28

*Toretto v. Donnelley Fin. Sols., Inc.*,
   523 F. Supp. 3d 464 (S.D.N.Y. 2021)............................................................................. 4

*Toretto v. Mediant Commc'ns, Inc.*,
   No. 19-cv-05208, 2020 WL 1288478 (N.D. Cal. Mar. 18, 2020) ............................... 4

*Toretto v. Donnelley Fin. Sols., Inc.*,
   2022 WL 348412 (Feb. 4, 2022).................................................................................... 4

*Vaquero v. Ashley Furniture Indus., Inc.*,
   824 F.3d 1150 (9th Cir. 2016) ..................................................................................... 29

*Viafara v. MCIZ Corp.*,
   No. 12 Civ. 7452, 2014 WL 1777438 (S.D.N.Y. May 1, 2014)......................... 25, 26

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)................................................................................................ 28, 29

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005)..................................................................................... 15, 16

**Statutes**

28 U.S.C. § 1715....................................................................................................................... 1

**Rules**

Fed. R. Civ. P. 12 ..................................................................................................................... 4

Fed. R. Civ. P. 23 ............................................................................................................. passim

**Other Authorities**

*Federal Practice and Procedure* § 1779 (3d ed. 2005) ............................................................ 32

## INTRODUCTION

Phillip Toretto, Daniel C. King, and Sheri Braun ("Plaintiffs"), individually and on behalf of all persons similarly situated, request that the Court preliminarily approve the proposed class settlement reached in this action arising from the April 2019 data incident of Defendant Mediant Communications Inc. ("Mediant"), and thus direct the issuance of notice to putative class members of the proposed settlement ("Settlement Agreement" or "Settlement"). Plaintiffs allege that the data incident at issue resulted in the exposure of the personal information of more than 224,000 individuals across the nation, including their Social Security Numbers, bank account information, and tax identification information (the "Data Security Incident").

After nearly three years of litigation, the Settlement Agreement proposes to settle the claims of Plaintiffs and those similarly situated brought in this Action. The proposed Settlement Class consists of: "the approximately 224,650 individuals who were mailed a notification that their personal information may have been impacted in the Data Security Incident experienced by Mediant on or around April 1, 2019."

The Settlement Agreement is an excellent result for the Settlement Class Members, negotiated at arms-length by counsel highly experienced in data breach litigation on both sides. It provides for: (1) cash payments to reimburse Settlement Class Members' documented out-of-pocket losses fairly traceable to the Data Security Incident, up to $10,000 per individual ("Out-of-Pocket Losses"); (2) reimbursement of Settlement Class Members' time spent remedying issues related to the Data Security Incident, up to eight hours at $20 per hour ("Lost Time"); (3) automatic access to two years of three-bureau credit monitoring services without the need to make a claim under the Settlement; (4) and robust contractual business practice commitments by Mediant relating to data security designed to prevent similar incidents in the future. The cash benefits being made available to Settlement Class Members are not subject to an aggregate cap

meaning that individual recoveries will not be reduced depending on the number of claimants. Finally, Mediant has agreed to separately pay notice and administration costs, as well as attorneys' fees, expenses, and service awards approved by the Court, which will not reduce any of the relief being made available to the Class.

As the proposed Settlement Agreement is fair, reasonable and adequate and meets the requirements of Rule 23(e)(1)(B), Plaintiffs respectfully request that this Court determine that it will likely approve the Settlement and certify the Settlement Class for purposes of entering judgment on the Settlement, and direct that notice of the Settlement be issued.

## SUMMARY OF THE LITIGATION

### I.   FACTUAL BACKGROUND

Public companies and mutual funds retain Mediant, together with Donnelley Financial Solutions, Inc. ("Donnelley"), a global risk and compliance solutions company, as their proxy agent to distribute materials to shareholders, coordinate shareholder votes, and tabulate voting results. Dkt. 57 (Second Amended Complaint ("Complaint" or "Compl.")), ¶ 1. To obtain and effectuate these services, the companies and funds provided Mediant and Donnelley with their investors' sensitive information. *Id*. Plaintiffs allege that on April 1, 2019, hackers exploited a vulnerability in Mediant's software to gain unauthorized access to four of its business email accounts. *Id*. ¶ 2. They further allege that the Data Security Incident involved the exfiltration of the personal information of over 200,000 individuals from all fifty states, the District of Columbia and Puerto Rico. Dkt. 57, ¶ 17. The personal information potentially accessed by cyber-criminals included identifying and financial information, including Social Security Numbers, tax identification numbers, bank account numbers, and information relating to the investors securities' holdings. *Id*. ¶¶ 2, 19. Plaintiffs also allege that although Mediant discovered the unauthorized access and disconnected the affected server from its system that same day, it

took nearly two months for the company to begin notifying affected individuals of the Data Security Incident. *Id.* ¶¶ 16-17.

Plaintiffs allege that they are investors whose personal information was compromised in the Data Security Incident. After receiving Mediant's letter informing them of the Data Security Incident and recommending that they monitor their financial and credit accounts, Plaintiffs allege that they each spent many hours checking those accounts for unauthorized activity. *Id.* ¶¶ 32, 39, 50. Toretto also purchased a Life Lock service plan for an annual fee of $300, and has obtained Kapersky security plans for each of his computers at an annual cost of $124.99. *Id.* ¶ 33. In addition, he experienced a significant increase in spam telephone calls after the Data Security Incident, which interfered with his work and daily life. *Id.* ¶ 34.

King suffered two fraudulent credit card charges, in June and August of 2019, for which he expended significant time and effort to be reimbursed. *Id.* ¶ 40. And Braun experienced repeated fraudulent attempts to open credit cards in her name; she estimates that she spent 40-50 hours, including filing police reports, to remedy the situation and prevent it from recurring. *Id.* ¶¶ 45-50.

## II.  PROCEDURAL HISTORY

### A.  LITIGATION HISTORY

This case started out as two separate lawsuits: Toretto and King filed a putative class action against Mediant in the Northern District of California, and Braun filed a similar action in the Southern District of Florida. In their Northern District of California case, Toretto and King requested and received jurisdictional discovery, which included both interrogatory responses and documents. *Toretto v. Mediant Commc'ns, Inc.*, No. 19-cv-05208, Dkt. No. 26, at 1. Through this discovery, Mediant disclosed information including the number of individuals in each state

who had received notification of the Data Security Incident, as well as correspondence that it had exchanged with state regulators regarding the circumstances surrounding the incident.

Mediant moved to dismiss the California and Florida cases, however, and after full briefing, both cases were dismissed for lack of personal jurisdiction. *Toretto v. Mediant Commc'ns, Inc.*, No. 19-cv-05208, 2020 WL 1288478, at *6 (N.D. Cal. Mar. 18, 2020); *Braun v. Mediant Commc'ns, Inc.*, No. 19-62563-CIV, 2020 WL 5038780, at *4 (S.D. Fla. Apr. 14, 2020). As Mediant is headquartered in New York, on March 30, 2020, Plaintiffs consolidated their actions and filed a class action complaint in this Court, asserting claims against Mediant and its alleged business partner, Donnelley, for negligence, negligence per se, breach of contract, unjust enrichment, a declaratory judgment, and violations of California and Florida statutes. Dkt. 1. Two amended complaints followed. Dkts. 23, 57.

Next came two rounds of motions to dismiss as to the Second Amended Complaint.[1] In the first round, both defendants challenged Plaintiffs' Article III standing to bring claims against them pursuant to Federal Rule of Civil Procedure 12(b)(1), with Donnelley arguing that the two defendants were not "partners" such that Donnelley could not be held liable for Mediant's cybersecurity deficiencies, Dkt. 68, at 5-14, and Mediant arguing that it could not be liable for breaching contracts that Donnelley had entered. Dkt 66, at 3-8. This Court denied both defendants' motions, finding that Plaintiffs had adequately alleged that Donnelley was a "direct cause" of their injuries and that they had standing to bring their breach of contract claims against both defendants. *Toretto v. Donnelley Fin. Sols., Inc.*, 523 F. Supp. 3d 464, 473, 475-76 (S.D.N.Y. 2021).

---

[1] At a pre-motion conference regarding defendants' anticipated motion to dismiss the Second Amended Complaint, the Court indicated that defendants should first file their motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), and then subsequently file any motions pursuant to Rule 12(b)(6), if necessary. Dkt. 78, at 1. The Court also stayed all non-jurisdictional discovery pending resolution of these motions. *Id.*

Defendants then once again moved to dismiss the Second Amended Complaint, this time pursuant to Rule 12(b)(6). Dkts. 94, 96. After considering the parties' full briefing on the motion, Dkts. 95, 98, 107, the Court granted Donnelley's motion to dismiss in full, found that Plaintiffs had adequately stated claims for negligence and a declaratory judgment against Mediant, dismissed the remainder of Plaintiffs' claims against Mediant, and granted leave to amend as to the dismissed claims. 2022 WL 348412, at *1, 6, 21 (Feb. 4, 2022). As to their negligence claim, the Court found that Plaintiffs had "plausibly allege[d] that Mediant had breached a duty to exercise reasonable care safeguarding Plaintiffs' personal information." *Id*. at *1.

In reaching this conclusion, this Court engaged in a thorough analysis of the contours of Plaintiffs' negligence claim against Mediant. This included threshold issues such as which law applied to the negligence claim against Mediant (New York), and whether New York's "economic loss" doctrine barred recovery for the types of losses suffered in a data incident. *Id*. at *7-9. After concluding that the doctrine does not bar Plaintiffs' negligence claim, *id*. at *9, this Court then addressed the parties' arguments as to each element of Plaintiffs' claim, starting with duty. *Id*. at *10-11. Citing in detail to the allegations in the Second Amended Complaint, this Court found that Plaintiffs had "plausibly alleged that Mediant owed them a duty to exercise reasonable care safeguarding their personal information." *Id*. at *11-12. In doing so, the Court rejected Mediant's argument, based on *Hammond v. The Bank of New York Mellon Corp*., No. 08-cv-6060, 2010 WL 2643307 (S.D.N.Y. June 25, 2010), that "loss of identity information is not a legally cognizable claim." 2022 WL 348412, at *12. The Court noted that "[d]ata breach jurisprudence has developed significantly in the last twelve years," and, pointing to several recent cases, explained that "[n]umerous courts applying New York law" have found "negligence claims in data breach cases" to survive past the pleadings stage. *Id*.

Citing to those same cases and the relevant portions of the Second Amended Complaint, the Court also found that Plaintiffs had adequately pled that Mediant had breached its duty to protect their personal information. *Id*. And finally, as to damages, while Mediant argued that Plaintiffs had not adequately asserted actual loss, this Court pointed to recent Second Circuit precedent establishing that "[w]here plaintiffs have shown a substantial risk of future identity theft or fraud, 'any expenses they have reasonably incurred to mitigate that risk likewise qualify as injury in fact.'" *Id*. at *13 (quoting *McMorris v. Carlos Lopez & Assocs.*, LLC 995 F.3d 295, 303 (2d Cir. 2021)). Thus, Plaintiffs' allegations that they "face[d] a substantial risk of harm" due to the theft of their personal information and incurred "mitigation costs to remediate that risk," was sufficient to satisfy the damages element of their claim. *Id*. at *13-14.

### B.   SETTLEMENT NEGOTIATIONS

On May 7, 2020, prior to the filing of this action, counsel for Plaintiffs and Mediant participated in a full-day mediation with mediator Rodney Max of Upchurch Watson White & Max. Declaration of Class Counsel ("Class Counsel Decl."), ¶ 18. Following that mediation, the Parties continued negotiations through Mr. Max and directly through counsel, but were unsuccessful at reaching resolution. *Id*. The parties thereafter suspended negotiations and proceeded to litigation in this Court. *Id*. ¶ 19. After Mediant's and Donnelley's 12(b)(6) motions to dismiss were fully briefed, the Parties re-engaged in good faith, arm's-length settlement discussions. *Id*. ¶¶ 24, 26. On February 4, 2022, the Court ruled on Defendants' 12(b)(6) motions, which helped define the scope the case. Dkt. 127. In order to continue their efforts toward mediation, the Parties filed a joint request to stay the Action pending the Parties' settlement negotiations. Dkt. 129. The Court granted this request on February 25, 2022. Dkt. 130. On March 28, 2022, the Parties participated in a second mediation with Mr. Max, which was successful. Class Counsel Decl., ¶ 25.

On March 30, 2022, the Parties finalized and executed a Term Sheet, which represented an agreement in principle on the terms of the Settlement. *Id*. After reaching this agreement in principle, the Parties finalized the terms of this Settlement Agreement and the exhibits attached hereto ("Settlement" or "Agreement"). *Id*.

<u>**SUMMARY OF PROPOSED SETTLEMENT AGREEMENT**</u>

The terms of the Parties' proposed Settlement Agreement are as follows:

**I.      THE SETTLEMENT CLASS**

The Settlement will provide benefits to all members of the following Settlement Class: "the approximately 224,650 individuals who were mailed a notification that their personal information may have been impacted in the Data Security Incident experienced by Mediant on or around April 1, 2019," subject to certain exclusions. *See* Settlement Agreement (Exhibit 1), ¶ 26(dd).

**II.     THE SETTLEMENT BENEFITS**

**A.      UNCAPPED CASH BENEFITS**

Following mailing of the notices, Settlement Class Members[2] will have 90 days to file claims for two types of losses arising from the Data Security Incident: Out-of-Pocket Losses and Lost Time. *Id*. ¶¶ 27-28, 39(h). The cash funds available to settle these claims is uncapped, meaning that Settlement Class Members will be paid 100% of their losses subject to the individual caps set forth in the Settlement Agreement, without any risk of a reduction based on the number of claimants. This is a material benefit as Settlement Class Members will know exactly what they are eligible to receive at the time they submit a claim.

---

[2] A "Settlement Class Member" is defined at paragraph 26(ee) of the Settlement to include "a Person who falls within the definition of the Settlement Class" and has neither properly excluded themselves from the Settlement Class nor been found guilty of aiding or abetting the Data Security Incident.

### 1.      Reimbursement of Out-of-Pocket Losses

The first component of the Settlement is reimbursement of Out-of-Pocket Losses that are "fairly traceable[] to the Data Security Incident," of up to $10,000 per individual. *Id.* ¶ 27. Per the Settlement, an Out-of-Pocket Loss will be presumed to be "fairly traceable" to the Data Security Incident if "(1) the timing of the losses occurred on or after April 1, 2019 (or the earliest verifiable date of intrusion); and (2) the personal information used to commit identity theft or fraud consisted of the same type of personal information that was provided to Mediant prior to the Data Security Incident." *Id.* ¶ 53.

The Settlement reimburses Settlement Class Members for the following broad range of harms that are likely to flow from the Data Security Incident:

- Unreimbursed costs, expenses, losses, or other charges incurred as a result of fraud or identity theft, falsified tax returns, or other possible misuse of a Settlement Class Member's personal information;

- Costs incurred on or after April 1, 2019 associated with freezing or unfreezing credit with any credit reporting agency;

- Miscellaneous expenses related to Out-of-Pocket Losses such as notary, fax, postage, copying, mileage, and long-distance telephone charges;

- Costs of credit monitoring or other mitigative costs that were incurred on or after April 1, 2019 and through the date of the Settlement Class Member's Claim submission;

- Documented time taken off work to address issues that are "fairly traceable" to the Data Security Incident, to be compensated at the Settlement Class Member's regular and documented hourly rate up to $250 per hour.

*Id.* ¶ 27.

Class Counsel believe that the $10,000 individual cap will be sufficient to cover all potential losses suffered as a result of the Data Security Incident. When a victim incurs out-of-pocket expenses relating to a data incident, the expenses are typically associated with seeking advice about how to address the incident (*e.g.*, paying for professional services), paying

incidental costs associated with identity theft or fraud (*e.g.*, overdraft fees or costs for sending documents by certified mail), or taking mitigative measures like paying for credit monitoring or credit freezes. Class Counsel Decl., ¶ 29. As such, the out-of-pocket expenses associated with a data incident are generally relatively modest, and rarely exceed several hundred dollars. *Id.* When victims spend more than this amount, it is typically due to professional services such as those provided by an accountant, attorney, or credit repair specialist. *Id.*[3] Thus, the high individual cap will ensure that even individuals who suffered outlier losses will be eligible to participate in the Settlement.

### 2.      Reimbursement for Lost Time

The second component of the Settlement is reimbursement for time spent remedying issues related to the Data Security Incident. *See* Ex. 1, ¶¶ 28. Settlement Class Members can make a claim for reimbursement for up to 8 hours of time spent at $20 per hour, with up to 3 hours requiring only a brief description of the time spent along with an attestation that the Settlement Class Member believes that the losses or expenses claimed were incurred as a result of the Data Security Incident, and an additional 5 hours with reasonable documentation of how the time was spent. *Id.* ¶ 28. This is an important benefit as it permits Settlement Class Members to receive compensation for their valuable time and effort spent dealing with the Data Security Incident. In the event that a Settlement Class Member lost wages or other employment income addressing issues relating to the Data Security Incident, that time is treated as an Out-of-Pocket Loss and the Settlement Class Member can receive compensation at their regular documented hourly rate up to $250 per hour, subject only to the $10,000 individual cap.

---

[3] The available research also supports this conclusion. A study conducted by the Ponemon Institute, a company that conducts independent research on privacy, data protection, and information security policies, found that in the aftermath of a data breach, 81% of data breach victims do not have any out-of-pocket losses, and for the 19% that do, those losses average to $38 per individual. Class Counsel Decl., ¶ 30.

### 3.    Claims Process

Submitting a claim for Out-of-Pocket Losses and Lost Time is not overly burdensome. Within 90 days of the Notice Date, a Settlement Class Member seeking reimbursement under these provisions must submit a Claim Form to the Settlement Administrator, either electronically or by mail, to obtain recovery for any losses or expenses incurred as a result of the Data Security Incident. *Id.* ¶¶ 29, 39(h). And where supporting documentation is required, documents such as receipts from third parties or highlighted account statements may be used to support a Claim. *Id.*, at Ex. C. The Settlement Administrator has discretion to determine whether a Settlement Class Member has adequately demonstrated a Claim, but must provide the Settlement Class Member with an opportunity to cure any deficiency. *Id.* ¶¶ 53-54. If the Settlement Administrator rejects a Claim for any reason, there is a simple appeals process whereby claimants may request an appeal to Class Counsel and Mediant's counsel. *Id.* ¶¶ 55-56.

### B.    THREE-BUREAU CREDIT MONITORING SERVICES

The Settlement also provides concrete benefits to Settlement Class Members concerned about future misuse of their compromised information. It makes available to all Settlement Class Members two years of free three-bureau credit monitoring services. *Id.* ¶ 30.[4] Credit monitoring is a service that monitors an individual's credit reports and alerts the individual when any change is made that could signal fraudulent activity, such as new credit card or loan applications, new credit inquiries, existing account changes, and new public records or address changes, among

---

[4] There are three major credit reporting agencies in the United States: Experian, Equifax and TransUnion. While many credit monitoring services only monitor an individual's credit activity with one agency, the more robust services such as the one offered to Settlement Class Members in the proposed Settlement monitor activity from all three major credit reporting agencies. Class Counsel Decl., ¶ 35. This is important because each agency operates independently from one another, and the information they receive from creditors can be different. As such, utilizing a credit monitoring services that monitors an individual's reports with all three agencies ensures that there are no gaps in coverage. *Id.*

others. *See* Class Counsel Decl. ¶ 34. Credit monitoring gives the individual the opportunity to confirm the accuracy of a credit change in real time and, if necessary, address the issue before fraud occurs or expands. *Id.*

Accordingly, the Parties have made available to all Settlement Class Members a robust monitoring service through Aura's Identity Defense Total Services ("Credit Monitoring Services"), which retails for approximately $15 per month. *Id.* ¶ 36. The Credit Monitoring Services are available to all Settlement Class Members regardless of whether they submit a claim for Out-of-Pocket Losses or Lost Time and include the following features:

- Three-bureau credit monitoring providing immediate notice of changes to the consumer's credit profile with Equifax, Experian, and TransUnion;

- Provides consumers with their credit scores on a monthly basis;

- Monitoring of high-risk transactions that include a consumer's personal information, such as payday loans, wire transfers, and account openings;

- Provides identity and authentication alerts to notify a consumer when their Social Security Number is used to verify an identity;

- Includes up to $1 million dollars reimbursement insurance covering losses due to identity theft or fraud;

- Provides access to Aura's team of fraud specialists, who can help a customer recover their identity and assets if they are a victim of identity theft; and

- Dark Web Monitoring providing notification if the consumer's information such as Social Security number, credit card numbers, financial account numbers, and health insurance number are found on the Dark Web.

*Id.* ¶ 35. This service will be easily accessible, as following final approval of the Settlement, activation instructions will be sent to all Settlement Class Members who have provided their email address and unique claim ID to the Settlement Administrator. Ex. 1, ¶ 30.

The Credit Monitoring Services provide significant value to the Settlement Class. While the Parties were able to secure discounted pricing based on the size of the Settlement Class, the

actual market value of this settlement benefit can fairly be estimated at approximately $360 per Settlement Class Member ($15 per Settlement Class Member for 24 months), or over $80 million in services made available to the Settlement Class as a whole. Class Counsel Decl., ¶ 36.

### C.   BUSINESS PRACTICE CHANGES

As an additional important benefit of the Settlement, Mediant has agreed to adopt and implement business practice changes to help protect the personal information in its possession. This will include security-system and practices enhancements described in Exhibit A to the Settlement Agreement, which is being submitted to the Court under seal. *Id*. ¶ 31.

### D.   ATTORNEYS' FEES AND EXPENSES AND SERVICE AWARDS

After the substantive terms of the Settlement were agreed upon, the Parties then turned to the payment of attorneys' fees, expenses, and service awards to Plaintiffs.[5] *Id*. ¶ 58; *see also* Class Counsel Decl. ¶ 39. Prior to that point, the Parties had only discussed that Mediant would separately pay for reasonable attorneys' fees and expenses, as approved by the Court. Ex. 1, ¶ 58; *see also* Class Counsel Decl. ¶ 39.

Pursuant to the Settlement, Mediant will not object to a request by Class Counsel for attorneys' fees and expenses in an amount not to exceed $700,000. Ex. 1, ¶ 59. Mediant has also agreed not to object to a request for service awards for the three Class Representatives in the amount of $2,500 each, in recognition of the time, effort, and expense they incurred in pursing claims that ultimately benefited the entire Settlement Class. *Id.* ¶ 60.

Mediant will pay for these attorneys' fees, expenses, and service awards, as approved by the Court, separate and apart from all other relief made available under the Settlement. *Id*. ¶¶ 61-62. As a result, the payment of attorneys' fees and service awards will not reduce any of the

---

[5] Plaintiffs are referred to in the Settlement Agreement as the "Class Representatives." Ex. 1, ¶ 26(i).

relief made available to Settlement Class Members, and they are intended to be considered separately from the fairness, reasonableness, and adequacy of the Settlement. *Id*. ¶ 62.

### E.   EXPENSES FOR SETTLEMENT ADMINISTRATION

Mediant will also pay all costs of notice and administration of the Settlement, including the fees and expenses of the Settlement Administrator. *Id*. ¶ 57.

### F.   PROPOSED NOTICE AND CLAIMS PROCESS

Within fourteen (14) days after the Court enters a preliminary approval order ("Preliminary Approval"), Mediant will provide the Settlement Administrator with the names and last known mailing address of Class Members that are currently in its possession. *Id*. ¶ 39(a). The Settlement Administrator will then check these addresses against the National Change of Address database to ensure that they are up-to-date, along with two other address verification systems. *See* Declaration of Cameron R. Azari ("Azari Decl."), ¶ 23. Then, starting within sixty (60) days after Preliminary Approval, the Settlement Administrator will mail notice of the Settlement ("Notice") to all Class Members via U.S. mail (the "Notice Date"). Ex. 1, ¶¶ 26(t); 39(f)-(g); Azari Decl. ¶ 22. Prior to dissemination of Notice, the Settlement Administrator will have set up both a website ("Settlement Website") where the Settlement Class may access information about the Settlement and submit Claims, and a toll-free number ("Settlement Toll-Free Number") where they may seek information relevant to the Settlement. *Id*. ¶¶ 39(c)-(d); Azari Decl. ¶¶ 25-27.

The form of Notice will be a postcard that (1) notifies Settlement Class Members of the Settlement and the benefits available to them under it; (2) includes a returnable, prepaid card by which they may send their email address to the Settlement Administrator for access to Credit Monitoring Services after the Settlement is finalized; (3) refers them to the Settlement Website for more information regarding the Settlement, including instructions on filing a Claim,

accessing Credit Monitoring Services, and excluding themselves from the Settlement; (4) provides them with the Settlement Toll-Free Number; (5) and provides them with a date certain by which they must take action. *Id.* ¶ 39(g); *see also id.*, Ex. D; Azari Decl. ¶¶ 22, 30. The Notice will be subject to review by the parties, by Cameron Azari, a Senior Vice President at Epiq and an expert who specializes in providing notice to class members, and the Court. *Id.* ¶ 39(e); *see also* Azari Decl., ¶¶ 1-4, 18-35.

The Settlement Website will include the Long Form Notice, which provides more details regarding the underlying Action and Settlement. The Long Form Notice also sets forth the various options for how to proceed, including (1) how to opt out of or object to the Settlement, (2) how to submit a Claim (including an option for doing so electronically), (3) the deadline to submit a Claim, opt out, or object, and (iv) information regarding the date, time, and location of the Final Fairness Hearing. Ex. 1, at Ex. B.

Settlement Class Members have 90 days after the Notice Date to make a Claim for benefits, or 40 days to opt out of the Settlement. *Id.* ¶¶ 39(h), 46. The Settlement Administrator will mail checks (or other electronic means of payment such as PayPal and Venmo) for approved claims within thirty (30) days of final approval of the Settlement (the "Effective Date"), or after the date the Claim is approved, whichever is latest. *Id.* ¶ 42.

The Parties believe that this notice plan is the best available under the circumstances as it involves direct mail notice to all Settlement Class Members. Class Counsel Decl., ¶¶ 42, 48. After engaging in a competitive bidding process, the Parties selected Epiq Class Action & Claims Solutions, Inc. ("Epiq") to serve as the Settlement Administrator, subject to Court approval. *Id.* ¶ 43. Epiq is well-versed in administering class action settlements, including in the data breach context. *See generally* Azari Decl. ¶¶ 4-8.

G.    **PROPOSED RELEASES**

In exchange for the benefits provided under the Settlement, Settlement Class Members will release "any and all claims and causes of action pleaded, that could have been pleaded, or otherwise arising out of or related to the activities stemming from the Data Security Incident or the Litigation." Ex. 1, ¶ 34. The Released Parties include Mediant, Donnelley, and the non-party investment funds, as set forth in the Agreement. *Id.* ¶¶ 26(aa), 34.[6]

## III.    ISSUING NOTICE OF THE PROPOSED SETTLEMENT TO THE CLASS IS JUSTIFIED.

A.    **STANDARD FOR ISSUANCE OF NOTICE**

A class action can only be settled with the court's approval. Fed. R. Civ. P. 23(e). Specifically, when a settlement agreement proposes to bind absent class members—as does the Parties' Settlement Agreement—a court must direct notice to all class members if it finds that it "will likely be able to (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B)(i)-(ii).

To approve the proposal under Rule 23(e)(2), the court must find that it is "fair, reasonable, and adequate" after considering whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

---

[6] As to the non-party investment funds, while Plaintiffs did not assert claims against them in this action, they allege that they could have done so, as Plaintiffs believe that any of their claims against the funds would have arisen out of the same factual predicate as the present Action: the Data Security Incident. Therefore, the investment funds may properly be released from liability through the Agreement. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 108–09 (2d Cir. 2005) ("The district court did not, therefore, err by finding that the non-party banks could be released from liability for conduct premised on the identical factual predicate of claims alleged in this action."); *see also In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262, 2002 WL 31663577, at *11 (S.D.N.Y. Nov. 26, 2002) ("[C]lass action settlements have in the past released claims against non-parties where, as here, the claims against the non-party being released were based on the same underlying factual predicate as the claims asserted against parties to the action being settled.")

> (C) the relief provided for the class is adequate, taking into account:
>
> > (i) the costs, risks, and delay of trial and appeal;
> >
> > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> >
> > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> >
> > (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). In addition to Rule 23(e)(2)'s enumerated factors, in evaluating a proposed settlement of a class action, courts in this Circuit consider the nine factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 488, 463 (2d Cir. 1974). *See, e.g.*, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019) ("The Court understands the new Rule 23(e) factors to add to, rather than displace, the *Grinnell* factors."). While the *Grinnell* factors substantially overlap with those in Rule 23(e)(2), the following factors "do not appear to be addressed by the Rule 23(e)(2) factors: the ability of the defendants to withstand a greater judgment; the range of reasonableness of the settlement fund in light of the best possible recovery; and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." *Id.* at 30, n.22. Plaintiffs thus address these factors separately at Sections III(B)(5-6), *infra*.

Within this framework, approval of a settlement is "within the Court's broad discretion." *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 423 (S.D.N.Y. 2001). "To grant preliminary approval, the court need only find that there is probable cause to submit the settlement to class members and hold a full-scale hearing as to its fairness." *Lizondro-Garcia v. Kefi LLC*, 300 F.R.D. 169, 179-80 (S.D.N.Y. 2014). "The compromise of complex litigation is

encouraged by the courts and favored by public policy." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005) (citation and quotation marks omitted).

**B.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE PURSUANT TO THE RULE 23(E) AND SECOND CIRCUIT FACTORS.**

An evaluation of the relevant factors confirms that the proposed Settlement is fair, adequate, and reasonable, and that this Court should therefore direct notice of it to the Settlement Class.

**1.    The Class Representatives and Class Counsel Have Provided Excellent Representation to the Class.[7]**

To preliminarily approve a settlement, Rule 23(e)(2)(A) requires a court to find that "the class representatives and class counsel have adequately represented the class." This analysis is an element of procedural fairness, and "'typically entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'" *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019) (quoting *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007)) (cleaned up).

First, the interests of the Class Representatives are aligned with those of other Settlement Class Members, as they allege that they all suffered and seek to redress the same injury: the potential theft of their personal information in the April 2019 Data Security Incident. *See GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 692 ("plaintiffs' interests are aligned with other class members' interests because they suffered the same injuries—monetary losses resulting from GSE bond transactions.").

---

[7] This Rule 23(e) factor corresponds with *Grinnell's* procedural fairness factors considering whether "plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests." *In re AOL Time Warner S'holder Derivative Litig.*, No. 02 Civ. 6302, 2006 WL 2572114, at *3 (S.D.N.Y. Sept. 6, 2006) (quoting *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)).

Next, Class Counsel are highly experienced in complex class actions and data breach litigation in particular, having been appointed as lead or co-lead counsel in many of the largest data breach cases in history. *See* Class Counsel Decl., ¶¶ 3-11. This knowledge and experience enabled Class Counsel to efficiently prosecute the case and negotiate a well-informed settlement. *See In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000), *aff'd sub nom.*, *D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001) (proposed settlement enjoyed a "presumption of fairness" where class counsel were "extremely experienced in class action litigation" and were involved in "similar litigation in other Courts" involving the same subject matter). Further, prior to filing this case, Class Counsel conducted a thorough investigation of the potential claims, including researching Defendants' business practices and relationship, consulting with experts regarding the nature and scope of the Data Security Incident, and interviewing potential Settlement Class Members. *See* Class Counsel Decl., ¶ 13.

Due to their experience in litigating data breach cases, investigation of this case, and this Court's decision defining the legal contours of their negligence claim, Class Counsel gained insight into the facts and legal issues necessary to make an informed judgment concerning settlement. And while discovery in this action was stayed pending the motions to dismiss, the Parties engaged in jurisdictional discovery in a predecessor action that provided insight into the numbers of potentially affected individuals and the circumstances surrounding the Data Security Incident. Class Counsel has also taken discovery in numerous data breach cases, giving them insight into the types of evidence that would be available in this case. Class Counsel Decl. ¶¶ 3-13. *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004) ("Formal discovery is not a prerequisite; the question is whether the parties had adequate information about their claims."). This factor therefore weighs in favor of approval.

### 2.      The Settlement was Negotiated at Arm's Length.[8]

Another element of procedural fairness, as required by Rule 23(e)(2)(B), is that "the proposal was negotiated at arm's length." A settlement "reached through arm's-length negotiations between experienced, capable counsel knowledgeable in complex class litigation . . . will enjoy a presumption of fairness." *See In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 693. As Class Counsel has attested, *see* Class Counsel Decl. ¶¶ 25-26, the negotiations leading to the present Settlement were hard fought over a number of years, arms-length, and involved the assistance of a mediator. *See In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 693 ("a mediator's involvement in settlement negotiations can help demonstrate their fairness."). Further, these negotiations were pursued by experienced counsel, Class Counsel Decl. ¶¶ 3-13, and only after vigorous adversarial litigation that spanned three years and several jurisdictions. Therefore, the nature of the Parties' negotiations leading to the proposed Settlement weighs in favor of approval.

### 3.      The Relief Provided for the Class is Adequate.

Taking into account the relevant factors, and as described below, the Settlement offers adequate relief to the Class Members.

---

[8] This Rule 23(e) factor corresponds to the *Grinnell* procedural fairness factor considering whether "the settlement resulted from arm's-length negotiations." *In re AOL Time Warner S'holder Derivative Litig.*, 2006 WL 2572114, at *3.

### i.    the costs, risks, and delay of trial and appeal;[9]

In assessing the substantive adequacy of a proposed class settlement, Rule 23(e) requires a court to consider "the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C)(i). Due to the contested nature of the litigation, it has taken close to three years to reach the present stage in the case, with Plaintiffs poised to file a Third Amended Complaint to address all pleading deficiencies identified by the Court. Indeed, the parties have briefed and argued substantial motions at every stage of the litigation arising from the Data Security Incident, including on personal jurisdiction, subject matter jurisdiction, and the adequacy of Plaintiffs' allegations. It is evident that further disputes lay ahead in this "inherently complex" class action, with risks to all parties. *In re Austrian and German Bank Holocaust Litig.*, 80 F. Supp. 2d at 174.

This is especially true given that Mediant continues to deny liability. Ex. 1, ¶ 25. And while Class Counsel is experienced in data breach cases and the legal and factual issues that they present, it is still a relatively new and developing field of litigation, with particular uncertainty as it relates to class certification and trial. As this Court recognized, jurisprudence on data breach claims "has developed significantly in the last twelve years." *Toretto*, 2022 WL 348412, at *12. This evolution is certain to continue, with the Second Circuit having just recently provided guidance on the threshold Article III standing issues involved in data breach cases. *See McMorris v. Carlos Lopez & Assoc.*, 995 F.3d 295, 300 (2d Cir. 2021) (noting that it was addressing "whether a plaintiff may establish standing based on a risk of future identity theft or fraud" for the first time); *see also In re Equifax Inc. Customer Data Security Breach Litig.*, No.

---

[9] This Rule 23(e)(2) factor "subsumes several *Grinnell* factors" going to the substantive fairness of the proposed settlement, "including (i) the complexity, expense and likely duration of the litigation, (ii) the risks of establishing liability, (iii) the risks of establishing damages, and (iv) the risks of maintaining the class through the trial. *See In re Payment Card Interchange Fee*, 330 F.R.D. at 36.

1:17-md-2800, 2020 WL 256132, at *32 (N.D. Ga. Mar. 17, 2020), *aff'd in relevant part* 999 F.3d 1247 (11th Cir. 2021), *cert. denied sub nom. Huang v. Spector*, 142 S. Ct. 431 (2021), *and cert. denied sub nom. Watkins v. Spector*, No. 21-638, 2022 WL 89334 (U.S. Jan. 10, 2022) (noting that data breach plaintiffs' "path forward remained difficult," as "[t]he law in data breach litigation remains uncertain and the applicable legal principles have continued to evolve").

Further, Mediant has already raised questions about the Settlement Class Members' ability to demonstrate that they suffered damages, Dkt. 95, at 8-11, a question that is certain to recur throughout the course of the litigation. And there are risks, too, to obtaining and maintaining class certification through trial. *See, e.g.*, *Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 318 (N.D. Cal. 2018) ("While there is no obvious reason to treat certification in a data-breach case differently than certification in other types of cases, the dearth of precedent makes continued litigation more risky."). In sum, it is likely that if this litigation continues, there will be further substantive motions and appeals from both sides, thus increasing both the risks and costs for each party. *See, e.g.*, *Banyai v. Mazur*, No. 00 Civ. 9806, 2007 WL 927583, at *9 (S.D.N.Y. Mar. 27, 2007) ("[I]f settlement has any purpose at all, it is to avoid a trial on the merits because of the uncertainty of the outcome.") (citation and quotation marks omitted).

And finally, the Data Security Incident occurred over three years ago. In addition to compensating Settlement Class Members for their Out-of-Pocket Losses and Lost Time, several provisions of the Settlement aim to protect the Settlement Class Members from the future risk of identity theft or fraud. For example, the Settlement provides Settlement Class Members with access to Credit Monitoring Services specifically designed to detect or limit potential misuse of their information. Mediant has also agreed, as part of this Settlement, that it has or will implement information security improvements. Ex. 1, ¶ 31. These benefits are more valuable to

Settlement Class Members if implemented now—rather than being held up through the course of a protracted litigation among the parties—and are not otherwise available at trial. *See In re Marsh ERISA Litig.*, 265 F.R.D. 128, 139 (S.D.N.Y. 2010) (recognizing "immediacy and certainty" of recovery as potential benefit to proposed settlement class); *In re Equifax,* 2020 WL 256132, at *7 (benefits to class in data breach settlement, "including credit monitoring and injunctive relief," have "added value by being available now, rather than after years of continued litigation"); *In re Anthem,* 327 F.R.D. at 318 (noting that the "negative effects of delay are especially acute" in the data breach context, where "credit monitoring is most important for the five years following a data breach" and "it is imperative that [defendant] implement the security measures sooner rather than later.").

Thus, the proposed Settlement helps to "avoid[] the costs, delays and multitude of other problems associated" with this "inherently complex" class action. *In re Austrian and German Bank Holocaust Litig*., 80 F. Supp. 2d at 174.

### ii.     the effectiveness of any proposed method of distributing relief to the class;

Rule 23(e)(2)(C)(ii) requires a court to consider "the effectiveness" of the "proposed method of distributing relief to the class, including the method of processing class-member claims." The claims processing method "should deter or defeat unjustified claims" without being "unduly demanding." Advisory Committee Note to 2018 Amendment to Fed. R. Civ. P. 23. These requirements are met here. The Parties have agreed to retain Epiq Class Action & Claims Solutions, Inc., an experienced and competent claims administrator familiar with handling data breach settlements. Azari Decl. ¶¶ 1-8. The over 224,000 individuals in the Settlement Class are readily identifiable from Mediant's records (and, in fact, have already been identified, as they are the recipients of Mediant's May 2019 letters regarding the Data Security Incident), and Notice of

the proposed Settlement and its terms will be individually mailed to each of them. Plaintiffs and the Settlement Administrator therefore anticipate a high rate of success in reaching the Settlement Class. *Id*. ¶ 19 (anticipating that Notice Plan individual notice efforts will reach 90% of the Settlement Class).

Once the Settlement Class has been notified of the Settlement, the process for submitting a Claim is designed to be consumer friendly. A Claim may be submitted either by mail or via the Settlement Website. Ex. 1, ¶¶ 39(c). A Claim for the first three hours of time spent addressing the Data Security Incident requires only an attestation that it was incurred in connection with the Data Security Incident and a brief description of how the time was spent. *Id*. ¶ 28. And claims for an additional five hours of time and Out-of-Pocket Losses may be supported by a variety of documents, including receipts from third parties and highlighted account statements. *Id*. ¶¶ 27-28; *see also id*. at Ex. C.[10] Finally, Settlement Class Members will have the opportunity to cure any deficiency identified by the Settlement Administrator, and may appeal an ultimate rejection of a claim to Class Counsel and Mediant's counsel. *Id*. ¶¶ 54-56.

Further, access to Credit Monitoring Services will be provided in a particularly accessible and convenient format: activation instructions sent via email to all Settlement Class Members who have provided their email address and unique claim ID to the Settlement Administrator. *Id*. ¶ 30. This service is available to all Settlement Class Members, whether or not they submit a Claim under the Settlement. *Id*. And of course, Settlement Class Members will benefit from

---

[10] Under the pre-2018-amendment factors developed by this Circuit, approval of the claims process also requires assessment of the allocation plan that it implements, which must be "fair and adequate" and have a "reasonable, rational basis," but "need not be perfect." *In re GSE Bonds Antitrust Litig*., 414 F.Supp.3d at 694 (citations and quotation marks omitted). As funds from the settlement (which is uncapped) are allocated based on time Class Members spent addressing the data incident and their out-of-pocket expenses, the plan has a "rational, reasonable" basis for allocating funds.

Mediant's information security improvements without needing to take any action. Therefore, the Settlement proposes effective methods of distributing relief to the Settlement Class Members, and with respect to Claims for compensation, deters unsubstantiated claims while without being so burdensome as to preclude those that are compensable.

### iii.    the terms of the proposed award of attorney's fees;

A court must consider "the terms of any proposed award of attorney's fees, including timing of payment" in assessing the fairness and adequacy of a proposed settlement. Fed. R. Civ. P. 23(e)(2)(C)(iii). Pursuant to the Settlement, Class Counsel will move the Court for up to $700,000 in fees and expenses. Ex. 1, ¶ 59. This fee provision was negotiated after the Parties' counsel agreed upon the substantive material terms of the Settlement and does not diminish the total monetary relief available to the Settlement Class. *Id*. ¶¶ 58, 62; *see also* Class Counsel Decl. ¶ 39. Further, the Settlement is not conditioned upon the Court's approval of the fee request and will become effective regardless of how that issue is decided. Ex. 1, ¶ 62.

Plaintiffs also intend to seek a service award of $2,500 each for the three Class Representatives in recognition of their time, effort, and risk in prosecuting this case on behalf of Settlement Class Members. *Id*. ¶ 60. As with the attorney's fees and expenses, the service awards were negotiated after the substantive terms of the Settlement, and the effectiveness of the Settlement is not tied to the Court's approval of this request. *Id*. ¶¶ 58, 62.

### iv.    and any agreement required to be identified under Rule 23(e)(3).

Rule 23(e) mandates that "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the proposal," and that the Court must then take into account any such agreements in assessing the relief provided in the settlement. *See* Fed. R. Civ.

P. 23(e)(2)(iii), (3). There is no agreement between the parties, except as set forth in the Settlement Agreement. Class Counsel Decl. ¶ 26.

### 4. The Settlement Treats Class Members Equitably Relative to Each Other.

The proposed Agreement treats all Settlement Class Members equitably relative to each other. Fed. R. Civ. P. 23(e)(2)(D). All Settlement Class Members will have the same opportunity to file a claim for Out-of-Pocket Losses and Lost Time, which means that monetary compensation will be apportioned in accordance with each Settlement Class Member's Claim. Further, because the funds available to pay claims is uncapped, no Settlement Class Member's recovery will be lessened because of another's recovery. This factor therefore weighs in favor of preliminary approval of the proposed Settlement Agreement.

### 5. The Ability of the Defendant to Withstand a Greater Judgment.

In assessing the fairness and adequacy of a proposed settlement, courts in this Circuit also assess a defendant's ability to withstand a greater judgment. *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 696 (S.D.N.Y. 2019) (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 488, 463 (2d Cir. 1974)). Given that there are no aggregate caps on the amount of money Mediant is required to spend under the Settlement to compensate Out-of-Pocket-Losses and Lost Time, and the Settlement provides for additional relief that would not otherwise be available at trial, this factor weighs in favor of settlement approval. *See, e.g., In re GSE Bonds Antitrust Litig.*, 414 F.Supp.3d at 696 (noting that "a defendant's cooperation 'tends to offset the fact that they would be able to withstand a larger judgment'") (quoting *In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F.Supp.2d 697, 702 (M.D. Pa. 2008)). And even if Mediant could withstand a greater judgment, this factor alone would not weigh against settlement. *See, e.g., Viafara v. MCIZ Corp.*, No. 12 Civ. 7452, 2014 WL 1777438, at *7 (S.D.N.Y. May 1, 2014)

("'defendant's ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair'") (citation omitted).

> **6.    Recovery Under the Settlement Is Within a Reasonable Range in Light of the Best Possible Recovery and All the Attendant Risks of Litigation.**

Finally, courts in this Circuit consider two related factors: "the range of reasonableness of the settlement" in light of (1) "the best possible recovery" and (2) "all the attendant risks of litigation." *In re GSE Bonds Litig.*, 414 F. Supp. 3d at 696 (citing *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 330 F.R.D. 11, 47-48 (E.D.N.Y. 2019)). Assessing these factors requires taking into account "the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Viafara*, 2014 WL 1777438, at *7 (citation and quotation marks omitted). First, as to the best possible recovery available to Plaintiffs, this Court has recognized that "costs incurred to mitigate" the future risk of "identity theft or fraud" are potentially compensable damages in a data breach case. *See Toretto*, 2022 WL 348412, at *14. Here, the Settlement would compensate Settlement Class Members for these claimed losses, reimbursing them for lost time and expenses in response to both realized and potential future harm from the Data Security Incident. Ex. 1, ¶¶ 27-28.

Further, the Settlement provides two types of benefits that would not be available to Settlement Class Members as traditional damages through the litigation process. First, it offers them access to high-quality credit monitoring, which courts often value at their retail price. *See Equifax*, 2020 WL 256132, at *17, 38 (noting that Court had "repeatedly lauded high-quality credit monitoring services as providing valuable class-member relief that would likely not otherwise be recoverable at trial," and recognizing that "the high-quality credit monitoring offered here is more valuable than the free or low-cost services typically available"); *In re*

*Anthem*, 327 F.R.D. at 323 ("Obviously, the credit monitoring services themselves confer an economic benefit, as they can retail for $9 to $20 a month."). Settlement Class Members need not have taken any steps to mitigate the potential harm from the Data Security Incident to access this benefit.

And second, the Settlement provides prospective relief beyond what would be available through litigation, in the form of improvements to Mediant's information security practices. *See, e.g.*, *Charron v. Pinnacle Group N.Y. LLC*, 874 F. Supp. 2d 179, 202 (S.D.N.Y. 2012) (noting that neither "Best Practices" nor "injunctive relief that are designed to alter how Pinnacle deals with its tenants on a going-forward basis . . . would be available to Class Members in any context outside of the Settlement—whether if the Class were decertified and they were forced to start from scratch, or if the liability claims . . . went to trial."); *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 972, 974 n.6 (8th Cir. 2018) (in data breach case "the injunctive relief offered under the settlement" – which included defendant's commitment to implement "a number of data-security measures" – "has value to all class members").

In light of the uncertainties involved in litigating these still-novel claims, as well as the potential difficulties in maintaining class certification and proving damages, *see supra* Section III(B)(3)(i), the Settlement is well within a reasonable range. *In re Facebook, Inc., IPO Sec. and Derivative Litig.*, 343 F. Supp. 3d 394, 414 (S.D.N.Y. 2018), *aff'd*, 822 F.App'x 40 (2d Cir. 2020) (although "particularized evidence ha[d] not been adduced to support a 'best possible' judgment, the agreed-upon figure [was] reasonable in light of the substantial risks to recovery.").

## IV.   THE PROPOSED SETTLEMENT CLASS MEETS THE REQUIREMENTS FOR CERTIFICATION.

To issue notice of a proposed class settlement, the court must find that it will "likely be able to . . . certify the class for purposes of judgment on the proposal." Fed. R. Civ. P.

23(e)(1)(B); *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Courts have routinely issued notice to proposed settlement classes in data incident cases, which are particularly well-suited to class-wide resolution. *See, e.g.*, *Abubaker v. Dominion Dental USA, Inc.*, No. 1:19-cv-01050, 2021 WL 6750844, at *2-4 (E.D. Va. Nov. 19, 2021); *Equifax*, 2020 WL 256132, at *11-14; *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, No. 1:16-c-03025, 2019 WL 3183651, at *3-4 (D. Md. July 15, 2019); *Anthem*, 327 F.R.D. at 306-16; *In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 14-md-02583, 2016 WL 6902351, at *1-3 (N.D. Ga. Aug. 23, 2016). This is because in data incident cases, an identifiable group of people suffered the same injury—the theft of their personal information—arising out of the same incident. So too here. As the proposed Settlement Class readily meets the requirements of Federal Rules of Civil Procedure 23(a) and (b)(3), this Court should conclude it will likely be able to certify it for purposes of judgment.

### A.     THE RULE 23(A) REQUIREMENTS ARE SATISFIED.

*Numerosity:* The proposed Settlement Class consists of more than 224,000 geographically dispersed individuals, rendering individual joinder impracticable. *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 138 (S.D.N.Y. 2019) ("'Numerosity is presumed for classes larger than forty members.'") (quoting *Pennsylvania v. Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014)). In addition to the sheer number of individuals in the Settlement Class, certifying a class is also superior to joinder because the low-dollar amount of the likely claims, along with other barriers to a potential recovery, *see* section III(B)(3)(i), *supra*, would make it difficult and inefficient for individuals to sue separately. *See In re SunEdison*, 329 F.R.D. at 138 ("[T]he numerosity inquiry is not strictly mathematical but must take into account the context of the particular case, in particular whether a class is superior to joinder based on other relevant factors.") (quoting *Pennsylvania*, 772 F.3d at 120)). And finally,

the geographic dispersion of the Settlement Class Members – who are located throughout the country, in every state and Puerto Rico – is yet another reason joinder would be impracticable. *See In re SunEdison*, 329 F.R.D. 329 at 138 ("geographic dispersion" a relevant factor in assessing whether class action is superior to joinder). Numerosity is readily satisfied.

 **Commonality:** "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury" such that their claims "can productively be litigated at once." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-350 (2011) (internal citations omitted). Here, the Settlement Class Members' claims share a common factual core, as they each suffered the same alleged injury—theft of their personal data in the Data Security Incident. The key legal questions are common, too: Did Mediant owe the putative Class Members a duty to safeguard their personal information, and if so, were its cybersecurity measures sufficient to satisfy that duty?

 As answering these questions "will resolve [] issue[s] that [are] central to the validity of each one of the claims in one stroke," *id.* at 350, commonality is satisfied. *See also Dominion*, 2021 WL 6750844, at *3 (identifying common questions in data breach case); *Equifax*, 2020 WL 256132, at *11-12 (noting that courts have found commonality requirement "readily satisfied" in the "context of data breach class actions"); *Anthem*, 327 F.R.D. at 308 (data breach "complaint contains a common contention capable of class-wide resolution—'one type of injury allegedly inflicted by one actor in violation of one legal norm'") (quoting *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1154 (9th Cir. 2016)).

 **Typicality:** To ensure that the Class Representatives "have the incentive to prove all the elements of the cause of action" that would otherwise have been individually brought by class members, Rule 23(a)(3) requires that "the claims or defenses of the representative parties are

typical of the claims or defenses of the class." *In re Oxford Health Plans*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000).

Here, the Class Representatives' litigation goals precisely align with those of the Settlement Class Members, as their claims arise from the same Data Security Incident and involve the same negligence theory as all other Settlement Class Members. *See Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) ("Typicality . . . 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'") (citation omitted); *Dominion*, 2021 WL 6750844, at *3 (typicality satisfied where "[l]ike the Representative Plaintiffs, other Settlement Class members were subject to the alleged data breach and have suffered the same types of injuries."); *Home Depot Inc.*, 2016 WL 6902351, at *2 (typicality satisfied where plaintiffs' claims "arise from the same data breach and Home Depot's conduct in connection with the data breach").

In other words, the Class Representatives are motivated to prove the same facts and legal theories as those they represent, and typicality is therefore satisfied.

***Adequacy of Representation:*** "The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. No such conflict of interest exists or will arise in this case, as the Class Representatives and the proposed Settlement Class Members allege that they all had their personal information compromised through the same Data Security Incident and all seek to remedy similar injuries. *See, e.g.*, *In re Equifax Inc. Customer Data Sec. Litig.*, 999 F.3d 1247, 1276 (11th Cir. 2021) (adequacy in data breach case satisfied as plaintiffs' claims "arise out of the same unifying event . . . seek redress for the same injury . . . and seek compensation for injuries associated with the

risk of identity theft"); *Anthem*, 327 F.R.D. at 309-10 (adequacy satisfied as "all Settlement Class Members are victims of the same event" and "seek the same relief: compensation for the harms already incurred as a result of the breach and protection against the use of their personal information going forward").

Further, as explained above, *see supra* Section III(B)(1), the Class Representatives have retained lawyers who are eminently qualified and experienced in both class action and data breach litigation. *See In re Oxford Health Plans*, 191 F.R.D. at 376 (noting that adequacy requirement is also concerned with whether "counsel for Plaintiffs is qualified and capable in this type of litigation."). The adequacy requirement is thus satisfied.

### B.   THE RULE 23(B)(3) REQUIREMENTS ARE SATISFIED.

Parties seeking class certification must also show that the action satisfies at least one subsection of Rule 23(b). Here, the proposed Settlement Class satisfies Rule 23(b)(3)'s requirements that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that class treatment is "superior to other available methods for fairly and efficiently adjudicating the controversy."[11]

***Predominance:*** Common questions predominate if the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. This requirement is satisfied "if resolution of some of the legal or factual questions . . . can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

---

[11] A settlement-only class need not meet one requirement of Rule 23: "[B]ecause the case will never go to trial, the court need not consider the manageability of the proceedings should the case or cases proceed to trial." *In re Initial Public Offering Sec. Litig.*, 260 F.R.D. 81, 88 (S.D.N.Y. 2009).

Plaintiffs allege that the key questions in this case are whether Mediant had a duty to secure its customers' personal data, and whether it took reasonable steps to do so. And as all Settlement Class Members assert that they face a substantial risk of harm from the same Data Security Incident, this question can be resolved by consideration of the same evidence as to Mediant's cybersecurity practices and e-mail servers. *See, e.g.*, *Dominion*, 2021 WL 6750844, at *3 (the "many common issues of fact and law that arise from the alleged data breach and Defendants' alleged conduct predominate over any individualized issues"); *Equifax*, 2020 WL 256132, at *13 (predominance satisfied in data breach case as "all claims arise out of a common course of conduct by Equifax."). Indeed, the question of whether a defendant took reasonable measures to secure customers' personal data "is the precise type of predominant question that makes class-wide adjudication worthwhile." *Anthem*, 327 F.R.D. at 312. And finally, as this Court has previously found that New York law applies to the negligence claims against Mediant, *Toretto*, 2022 WL 348412, at *8, there is no concern that any "variations in state law will [] predominate over the common questions." *Equifax*, 2020 WL 256132, at *13.

**Superiority:** "[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy . . . ." 7AA Charles Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1779 (3d ed. 2005). Individually litigating the low-dollar-value claims of over 224,000 people dispersed throughout the country, all arising out of the same Data Security Incident, would be uneconomical and inefficient for both the Settlement Class Members and the courts. The superiority requirement is thus satisfied. *See In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 702 (S.D.N.Y. 2019) ("large size of the class and potentially small recovery of many individual plaintiffs suggests that

class members' interests are likely served by a class action"); *Equifax*, 2020 WL 256132, at *14;

*Anthem*, 327 F.R.D. at 315-16.

## V.      THE COURT SHOULD DESIGNATE INTERIM CLASS COUNSEL.

When certifying a class, Rule 23 requires a court to appoint class counsel that will fairly

and adequately represent the class members. Fed. R. Civ. P. 23(g)(1)(B). In making this

determination, the Court considers counsel's work in identifying or investigating potential

claims; experience in handling class actions or other complex litigation and the types of claims

asserted in the case; knowledge of the applicable law; and resources committed to representing

the class. Fed. R. Civ. P. 23(g)(1)(A)(i–iv).

The parties seek designation of J. Austin Moore of Stueve Siegel Hanson LLP, Elaine A.

Ryan of Auer Ryan, PC, and John A. Yanchunis of Morgan & Morgan, as interim Class Counsel

in this Action. As noted above, section III(B)(1) *supra*, Class Counsel are highly experienced in

data breach litigation and have demonstrated the hard work, legal scholarship, experience, and

resources they bring to bear, likely resulting in the Settlement now before the Court. In addition,

they have expended considerable time and resources in investigating and vigorously litigating the

claims in this action. The Court should thus appoint them as interim Class Counsel under Rule

23(g)(3) to act on behalf of the Settlement Class in carrying out the Notice and Claims process.

## VI.     THE COURT SHOULD APPROVE THE NOTICE PLAN, NOTICES, AND
## CLAIM FORM, AND APPOINT THE SETTLEMENT ADMINISTRATOR.

To satisfy the requirements of both Rule 23 and due process, Rule 23(c)(2)(B) provides

that, "[f]or any class certified under Rule 23(b)(3) . . . the court must direct to class members the

best notice that is practicable under the circumstances, including individual notice to all members

who can be identified through reasonable effort." *See also* Rule 23(e)(1) (requiring that when a

class is certified for settlement, "the court must direct notice in a reasonable manner to all class members who would be bound by the court's judgment").

A Rule 23 notice "will satisfy due process when it describe[s] the terms of the settlement generally . . . inform[s] the class about the allocation of attorneys' fees, and provide[s] specific information regarding the date, time, and place of the final approval hearing." *Charron v. Pinnacle Group N.Y. LLC*, 874 F.Supp.2d 179, 191 (S.D.N.Y. 2012) (cleaned up). "Notice is considered 'adequate if it may be understood by the average class member.'" *Id.* (citation omitted).

The proposed Notice meets these requirements. *See* Ex. 1, at Exs. B, C, D; *see also* Azari Decl. ¶¶ 10, 18-19, 21-35. First, the Settlement Administrator expects that by mailing the postcard Notice to Settlement Class Members at their last known address, with methods to check and update addresses as necessary, the notice efforts will reach at least 90% of the Settlement Class. Azari Decl. ¶¶ 19, 21-24. Additionally, with the assistance of a highly-experienced notice expert who helped design and prepared the notice, the proposed postcard Notice clearly and concisely summarizes the terms of the Settlement, and refers Class Members to the Long Form Notice on the Settlement Website for step-by-step instructions on how a Class Member may make a claim for monetary compensation, as well as how to access Credit Monitoring. See Ex. 1, at Ex. D; Azari Decl. ¶¶ 22, 28-29. The Long Form Notice also specifies the amount of attorney's fees and expenses that Class Counsel will seek, as well as the proposed service awards to the Class Representatives. Ex. 1, at Ex. B. Finally, it clearly describes Class Members' various options for proceeding, including how to opt out of or object to the Settlement, and how to contact Class Counsel and the Settlement Administrator. Azari Decl. ¶¶ 28-30. This Court should therefore direct that the proposed Notice be sent to the Class Members.

## CONCLUSION

For the reasons set forth set forth above, and as set forth in their Proposed Order, Plaintiffs request that the Court (1) find that it will likely be able to approve the Settlement as fair, reasonable, and adequate and certify the Settlement Class for purposes of entering judgment on the Settlement under Federal Rule of Civil Procedure 23(e), and to therefore direct that Notice be issued to the Settlement Class; (2) appoint interim Class Counsel; (3) approve the proposed Notice plan; (4) appoint the Settlement Administrator; and (5) set a date for the Final Fairness Hearing.

Dated: June 17, 2022

<div style="margin-left:40%">

/s/ *J. Austin Moore*
Norman E. Siegel (*pro hac vice*)
J. Austin Moore (*pro hac vice* )
Lindsay Todd Perkins (*pro hac vice*)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
siegel@stuevesiegel.com
moore@stuevesiegel.com
perkins@stuevesiegel.com

John A. Yanchunis (*pro hac vice*)
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Tel.: 813-223-5505
jyanchunis@forthepeople.com

Elaine A. Ryan (*pro hac vice*)
**AUER RYAN PC**
20987 N. John Wayne Parkway, B104-374
Maricopa, AZ 85139
Tel: 520-705-7332
eryan@auer-ryan.com

*Counsel for Plaintiffs and the Class*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered users.

*/s/ J. Austin Moore*

## APPENDIX A – TIMELINE OF SETTLEMENT EVENTS

For convenience, proposed dates and deadlines leading to a Final Fairness Hearing are provided below and in the proposed order separately submitted to the Court.

| EVENT | DATE |
|-------|------|
| Mediant provides CAFA notice required by 28 U.S.C. § 1715(b) | Within 10 days after the filing of Plaintiff's Motion for Preliminary Approval |
| Mediant to Provide Class Member Information | Within 14 days following entry of Preliminary Approval Order |
| Notice Date | Within 60 days after the Preliminary Approval Order |
| Notice Program Concludes | Within 75 days after the Preliminary Approval Order |
| Compliance with CAFA waiting period under 28 U.S.C. § 1715(d) | 90 days after the appropriate governmental officials are served with CAFA notice |
| Postmark deadline for requests for exclusion (Opt-out) or Objections | 40 days after the Notice Date |
| Postmark/filing deadline for filing claims | 90 days after the Notice Date |
| Motion for Attorneys' Fees, Expenses, and Service Awards to the Plaintiffs | 21 days Prior to Opt-Out and Objections Deadlines |
| Motion for Final Approval to be filed by Class Counsel | 14 days before the Final Approval Hearing |
| Final Approval Hearing | |