**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PHILLIP TORETTO, DANIEL C. KING, and SHERI BRAUN, individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br>       v.<br><br>DONNELLEY FINANCIAL SOLUTIONS, INC. and MEDIANT COMMUNICATIONS, INC., individually and as general partners,<br><br>       Defendants. | Case No. 1:20-cv-02667-GHW |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT PURSUANT TO RULE 23(e)**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

SUMMARY OF THE LITIGATION ................................................................................... 1

I.     Factual Background ....................................................................................................... 1

II.    Procedural History ......................................................................................................... 3

      A.      Litigation history ............................................................................................. 3

      B.      Settlement Negotiations .................................................................................. 6

      C.      Summary Of Proposed Settlement Agreement .............................................. 6

           1.      The Settlement Class........................................................................... 6

           2.      The Settlement Benefits ...................................................................... 7

                i.      Uncapped Cash Benefits ........................................................ 7

                ii.     Reimbursement of Out-of-Pocket Losses ....................................... 7

                iii.    Reimbursement for Lost Time ............................................... 8

           3.      Claims Process .................................................................................... 8

           4.      Three-Bureau Credit Monitoring Services.......................................... 9

           5.      Business Practice Changes................................................................. 11

           6.      Attorneys' Fees and Expenses and Service Awards ............................. 11

           7.      Expenses for Settlement Administration ............................................ 12

           8.      Proposed Releases............................................................................. 12

      D.      Preliminary Approval and Administration of Notice............................................ 12

      E.      The Settlement Class Members' Favorable Response to the Settlement.............. 15

ARGUMENT ....................................................................................................................... 15

I.     The Court Should Grant Final Approval of the Settlement ............................................. 15

      A.      The Proposed Settlement Is Fair, Reasonable, and Adequate Pursuant
                to the Rule 23(e) and Second Circuit Factors. ..................................................... 15

1. The Class Representatives and Class Counsel Have Provided Excellent Representation to the Class. ..................................................... 17

2. The Settlement was Negotiated at Arm's Length. ................................... 19

3. The Relief Provided for the Class is Adequate. ....................................... 19

    i. the costs, risks, and delay of trial and appeal; ............................. 20

    ii. the effectiveness of any proposed method of distributing relief to the class; ........................................................................ 23

    iii. the terms of the proposed award of attorney's fees; .................... 25

    iv. and any agreement required to be identified under Rule 23(e)(3). ................................................................................ 26

4. The Settlement Treats Class Members Equitably Relative to Each Other. ........................................................................................... 26

5. The Ability of the Defendant to Withstand a Greater Judgment. ............. 27

6. Recovery Under the Settlement Is Within a Reasonable Range in Light of the Best Possible Recovery and All the Attendant Risks of Litigation. ............................................................. 27

II. The Court Should Certify the Settlement Class for Purposes of Judgment ..................... 30

    A. The Rule 23(a) Requirements Are Satisfied. ........................................................ 31

    B. The Rule 23(b)(3) Requirements Are Satisfied. .................................................. 34

CONCLUSION ........................................................................................................................ 35

CERTIFICATE OF SERVICE ................................................................................................ 36

**<u>TABLE OF AUTHORITIES</u>**

**Cases**

*Abubaker v. Dominion Dental USA, Inc.*,
    No. 1:19-cv-01050, 2021 WL 6750844 (E.D. Va. Nov. 19, 2021) .............................. 30, 32, 34

*Amchem Prods. Inc. v. Windsor*,
    521 U.S. 591 (1997)........................................................................................................... 33, 34

*Anthem, Inc. Data Breach Litig.*,
    327 F.R.D. 299 (N.D. Cal. 2018)....................................................................................... *passim*

*Banyai v. Mazur*,
    No. 00 Civ. 9806, 2007 WL 927583 (S.D.N.Y. Mar. 27, 2007) ............................................. 21

*Braun v. Mediant Commc'ns, Inc.*,
    No. 19-62563-CIV, 2020 WL 5038780 (S.D. Fla. Apr. 14, 2020)........................................... 3

*Charron v. Pinnacle Group N.Y. LLC*,
    874 F. Supp. 2d 179 (S.D.N.Y. 2012)..................................................................................... 29

*City of Detroit v. Grinnell Corp.*,
    495 F.2d  (2d Cir. 1974)................................................................................................... 16, 27

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007)...................................................................................................... 17

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d Cir. 2001)...................................................................................................... 17

*Flores v. CGI Inc.*,
    22-cv-350, 2022 WL 13804077 (S.D.N.Y. Oct. 21, 2022)...................................................... 20

*Goldberger v. Integrated Resources, Inc.*,
    209 F.3d 43 (2d Cir. 2000)...................................................................................................... 25

*Hammond v. The Bank of New York Mellon Corp.*,
    No. 08-cv-6060, 2010 WL 2643307 (S.D.N.Y. June 25, 2010) ................................................ 5

*Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*,
    No. 1:16-c-03025, 2019 WL 3183651 (D. Md. July 15, 2019) ............................................... 30

*In re Am. Bank Note Holographics, Inc.*,
    127 F. Supp. 2d 418 (S.D.N.Y. 2001)..................................................................................... 16

*In re Am. Int'l Group, Inc. Sec. Litig.*,
  689 F.3d 229 (2d Cir. 2012) ................................................................ 30

*In re AOL Time Warner S'holder Derivative Litig.*,
  No. 02 Civ. 6302, 2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006) ....................................... 17, 19

*In re Austrian & German Bank Holocaust Litig.*,
  80 F. Supp. 2d 164 (S.D.N.Y. 2000) .............................................. 18, 20, 23

*In re Equifax Inc. Customer Data Sec. Litig.*,
  999 F.3d 1247 (11th Cir. 2021) ....................................................... 33

*In re Equifax Inc. Customer Data Security Breach Litig.*,
  No. 1:17-md-2800, 2020 WL 256132 (N.D. Ga. Mar. 17, 2020) .................................... *passim*

*In re Facebook, Inc., IPO Sec. and Derivative Litig.*,
  343 F. Supp. 3d 394 (S.D.N.Y. 2018) ............................................... 29

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ................................................... 18

*In re GSE Bonds Antitrust Litig.*,
  414 F. Supp. 3d 686 (S.D.N.Y. 2019) .............................................. *passim*

*In re Initial Public Offering Sec. Litig.*,
  260 F.R.D. 81 (S.D.N.Y. 2009) ................................................... 34

*In re Lloyd's Am. Trust Fund Litig.*,
  No. 96 Civ. 1262, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) ......................................... 12

*In re Marsh ERISA Litig.*,
  265 F.R.D. 128 (S.D.N.Y. 2010) ................................................... 22

*In re Oxford Health Plans*,
  191 F.R.D. 369 (S.D.N.Y. 2000) ................................................ 32, 33

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  330 F.R.D. 11 (E.D.N.Y. 2019) ............................................... 16, 20, 27

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
  584 F.Supp.2d 697 (M.D. Pa. 2008) .................................................. 27

*In re SunEdison, Inc. Sec. Litig.*,
  329 F.R.D. 124 (S.D.N.Y. 2019) ................................................... 31

*In re Target Corp. Customer Data Sec. Breach Litig.*,
892 F.3d 968 (8th Cir. 2018) ................................................................................ 29

*In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*,
No. 14-md-02583, 2016 WL 6902351 (N.D. Ga. Aug. 23, 2016) ...................................... 30, 33

*Marisol A. v. Giuliani*,
126 F.3d 372 (2d Cir. 1997) ................................................................................. 32

*McMorris v. Carlos Lopez & Assocs.*, LLC,
995 F.3d 295 (2d Cir. 2021) ............................................................................... 5, 21

*Moore v. PaineWebber, Inc.*,
306 F.3d 1247 (2d Cir. 2002) ................................................................................ 34

*Pennsylvania v. Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*,
772 F.3d 111 (2d Cir. 2014) ................................................................................. 31

*RMED Intern., Inc., v. Sloan's Supermarkets, Inc.*,
No. 94 Civ. 5587, 2003 WL 21136726 (S.D.N.Y. May 15, 2003) ........................................ 30

*Ross v. A.H. Robins*,
700 F.Supp. 682 (S.D.N.Y. 1988) ........................................................................... 30

*Toretto v. Donnelley Fin. Sols., Inc.*,
523 F. Supp. 3d 464 (S.D.N.Y. 2021) ........................................................................ 4

*Toretto v. Donnelley Fin. Sols., Inc.*,
2022 WL 348412 (Feb. 4, 2022) ........................................................................ *passim*

*Toretto v. Mediant Commc'ns, Inc.*,
No. 19-cv-05208, 2020 WL 1288478 (N.D. Cal. Mar. 18, 2020) ........................................... 3

*Vaquero v. Ashley Furniture Indus., Inc.*,
824 F.3d 1150 (9th Cir. 2016) ............................................................................... 32

*Viafara v. MCIZ Corp.*,
No. 12 Civ. 7452, 2014 WL 1777438 (S.D.N.Y. May 1, 2014) ........................................ 27, 28

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ....................................................................................... 31, 32

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005) ............................................................................... 12, 16

*Wright v. Stern*,
   553 F.Supp.2d 337 (S.D.N.Y. 2008)....................................................................................... 20, 29

**Rules**

Fed. R. Civ. P. 23 ................................................................................................................ *passim*

Fed. R. Civ. P. 12 ....................................................................................................................... 4

**Other Authorities**

*Federal Practice and Procedure* § 1779 (3d ed. 2005) ................................................................. 35

## INTRODUCTION

Phillip Toretto, Daniel C. King, and Sheri Braun ("Plaintiffs"), individually and on behalf of all persons similarly situated, request that the Court grant final approval of the proposed class settlement reached in this action arising from the April 2019 data security incident experienced by Defendant Mediant Communications Inc. ("Mediant"). This Court granted the Plaintiffs' Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement Pursuant to Rule 23(e) on June 24, 2022, finding that it would likely approve the Settlement as fair, reasonable, and adequate, that it would likely certify the Settlement Class for purposes of judgment on the proposal, and thus directing that notice be issued to the Class. Dkt. 153, ¶¶ 6-15.

Pursuant to the Court's direction, the appointed claims administrator initiated the notice program on August 23, 2022. In response to notice of the Settlement, which reached over 98% of the identifiable Settlement Class Members, 6,519 individuals have requested enrollment in Credit Monitoring Services, and 1,147 have made claims for Lost Time or Expenses. There are no objectors to the Settlement, and only one individual in the Settlement Class has opted out.

Given the Settlement Class's favorable response to the Settlement and their interest in its benefits, Plaintiffs ask this Court to (1) grant final approval of the Settlement as fair, reasonable, and adequate under Rule 23(e)(2); (2) certify the Settlement Class for purposes of judgment on the proposal; (3) grant Class Counsel's Unopposed Motion for an Award of Attorneys' Fees and Expenses and for Plaintiff Service Awards; and (4) enter final judgment after the Final Approval Hearing.

## SUMMARY OF THE LITIGATION

### I. FACTUAL BACKGROUND

Plaintiffs allege as follows: public companies and mutual funds retain Mediant, together with Donnelley Financial Solutions, Inc. ("Donnelley"), a global risk and compliance solutions

company, as their proxy agent to distribute materials to shareholders, coordinate shareholder votes, and tabulate voting results. Dkt. 57 (Second Amended Complaint ("Complaint" or "Compl.")), ¶ 1. To obtain and effectuate these services, the companies and funds provided Mediant and Donnelley with their investors' sensitive information. *Id*. Plaintiffs allege that on April 1, 2019, hackers exploited a vulnerability in Mediant's software to gain unauthorized access to four of its business email accounts (the "Data Security Incident"). *Id*. ¶ 2. They further allege that the Data Security Incident involved the exfiltration of the personal information of over 200,000 individuals from all fifty states, the District of Columbia and Puerto Rico. *Id*. ¶ 17. The personal information potentially accessed by cyber-criminals may have included identifying and financial information, including Social Security Numbers, tax identification numbers, bank account numbers, and information relating to the investors' securities' holdings. *Id*. ¶¶ 2, 19. Plaintiffs also allege that although Mediant discovered the unauthorized access and disconnected the affected server from its system that same day, it took nearly two months for the company to begin notifying affected individuals of the Data Security Incident. *Id*. ¶¶ 16-17.

Plaintiffs allege that they are investors whose personal information was potentially implicated in the Data Security Incident. After receiving Mediant's letter informing them of the Data Security Incident and recommending that they monitor their financial and credit accounts, Plaintiffs allege that they each spent many hours checking those accounts for unauthorized activity. *Id*. ¶¶ 32, 39, 50. Toretto also purchased a Life Lock service plan for an annual fee of $300 and has obtained Kapersky security plans for each of his computers at an annual cost of $124.99. *Id*. ¶ 33. In addition, he experienced a significant increase in spam telephone calls after the Data Security Incident, which interfered with his work and daily life. *Id*. ¶ 34.

King alleges that he suffered two fraudulent credit card charges, in June and August of 2019, for which he expended significant time and effort to be reimbursed. *Id.* ¶ 40. And Braun alleges that she experienced repeated fraudulent attempts to open credit cards in her name; she estimates that she spent 40-50 hours, including filing police reports, to remedy the situation and prevent it from recurring. *Id.* ¶¶ 45-50.

## II.   PROCEDURAL HISTORY

### A.   LITIGATION HISTORY

This case started out as two separate lawsuits: Toretto and King filed a putative class action against Mediant in the Northern District of California, and Braun filed a similar action in the Southern District of Florida. In their Northern District of California case, Toretto and King requested and received jurisdictional discovery, which included both interrogatory responses and documents. *Toretto v. Mediant Commc'ns, Inc.*, No. 19-cv-05208, Dkt. 26, at 1. Through this discovery, Mediant disclosed information including the number of individuals in each state who had received notification of the Data Security Incident, as well as correspondence that it had exchanged with state regulators regarding the circumstances surrounding the incident.

Mediant moved to dismiss the California and Florida cases, and after full briefing, both cases were dismissed for lack of personal jurisdiction. *Toretto v. Mediant Commc'ns, Inc.*, No. 19-cv-05208, 2020 WL 1288478, at *6 (N.D. Cal. Mar. 18, 2020); *Braun v. Mediant Commc'ns, Inc.*, No. 19-62563-CIV, 2020 WL 5038780, at *4 (S.D. Fla. Apr. 14, 2020). As Mediant is headquartered in New York, on March 30, 2020, Plaintiffs consolidated their actions and filed a class action complaint in this Court, asserting claims against Mediant and its alleged business partner, Donnelley, for negligence, negligence per se, breach of contract, unjust enrichment, a declaratory judgment, and violations of California and Florida statutes. Dkt. 1. Two amended complaints followed. Dkts. 23, 57.

Next came two rounds of motions to dismiss as to the Second Amended Complaint.[1] In the first round, both defendants challenged Plaintiffs' Article III standing to bring claims against them pursuant to Federal Rule of Civil Procedure 12(b)(1), with Donnelley arguing that the two defendants were not "partners" such that Donnelley could be held liable for Mediant's alleged cybersecurity deficiencies, Dkt. 68, at 5-14, and Mediant arguing that it could not be liable for allegedly breaching contracts that Donnelley had entered. Dkt. 66, at 3-8. This Court denied both defendants' motions, finding that, for the purposes of Article III standing, Plaintiffs had adequately alleged that Donnelley was a "direct cause" of their injuries and that they had standing to bring their breach of contract claims against both defendants. *Toretto v. Donnelley Fin. Sols., Inc*., 523 F. Supp. 3d 464, 473, 475-76 (S.D.N.Y. 2021).

Defendants then once again moved to dismiss the Second Amended Complaint, this time pursuant to Rule 12(b)(6). Dkts. 94, 96. After considering the parties' full briefing on the motion, Dkts. 95, 98, 107, the Court granted Donnelley's motion to dismiss in full, found that Plaintiffs had adequately stated claims for negligence and a declaratory judgment against Mediant, dismissed the remainder of Plaintiffs' claims against Mediant, and granted leave to amend as to the dismissed claims. 2022 WL 348412, at *1, 6, 21 (Feb. 4, 2022). As to their negligence claim, the Court found that Plaintiffs had "plausibly allege[d] that Mediant had breached a duty to exercise reasonable care safeguarding Plaintiffs' personal information." *Id*. at *1.

In reaching this conclusion, this Court engaged in a thorough analysis of the contours of Plaintiffs' negligence claim against Mediant. This included threshold issues such as which law

---

[1] At a pre-motion conference regarding defendants' anticipated motion to dismiss the Second Amended Complaint, the Court indicated that defendants should first file their motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), and then subsequently file any motions pursuant to Rule 12(b)(6), if necessary. Dkt. 78, at 1. The Court also stayed all non-jurisdictional discovery pending resolution of these motions. *Id*.

applied to the negligence claim against Mediant (New York), and whether New York's "economic loss" doctrine barred recovery for the types of losses suffered in a data incident. *Id*. at *7-9. After concluding that the doctrine does not bar Plaintiffs' negligence claim, *id*. at *9, this Court then addressed the parties' arguments as to each element of Plaintiffs' claim, starting with duty. *Id*. at *10-11. Citing in detail to the allegations in the Second Amended Complaint, this Court found that Plaintiffs had "plausibly alleged that Mediant owed them a duty to exercise reasonable care safeguarding their personal information." *Id*. at *11-12. In doing so, the Court rejected Mediant's argument, based on *Hammond v. The Bank of New York Mellon Corp*., No. 08-cv-6060, 2010 WL 2643307 (S.D.N.Y. June 25, 2010), that "loss of identity information is not a legally cognizable claim." 2022 WL 348412, at *12. The Court noted that "[d]ata breach jurisprudence has developed significantly in the last twelve years," and, pointing to several recent cases, explained that "[n]umerous courts applying New York law" have found "negligence claims in data breach cases" to survive past the pleadings stage. *Id*.

Citing to those same cases and the relevant portions of the Second Amended Complaint, the Court also found that Plaintiffs had adequately pled that Mediant had breached its duty to protect their personal information. *Id*. And finally, as to damages, while Mediant argued that Plaintiffs had not adequately asserted actual loss, this Court pointed to recent Second Circuit precedent establishing that "[w]here plaintiffs have shown a substantial risk of future identity theft or fraud, 'any expenses they have reasonably incurred to mitigate that risk likewise qualify as injury in fact.'" *Id*. at *13 (quoting *McMorris v. Carlos Lopez & Assocs*., LLC 995 F.3d 295, 303 (2d Cir. 2021)). Thus, Plaintiffs' allegations that they "face[d] a substantial risk of harm" due to the theft of their personal information and incurred "mitigation costs to remediate that risk" were sufficient to satisfy the damages element of their claim. *Id*. at *13-14.

### B.   SETTLEMENT NEGOTIATIONS

On May 7, 2020, prior to the filing of this action, counsel for Plaintiffs and Mediant participated in a full-day mediation with mediator Rodney Max of Upchurch Watson White & Max. *See* Dkt. 147, ¶ 18 ("Class Counsel Decl."). Following that mediation, the Parties continued negotiations through Mr. Max and directly through counsel, but were unsuccessful at reaching resolution. *Id*. The parties thereafter suspended negotiations and proceeded to litigation in this Court. *Id*. ¶ 19. After Mediant's and Donnelley's 12(b)(6) motions to dismiss were fully briefed, the Parties re-engaged in good faith, arm's-length settlement discussions. *Id*. ¶¶ 24, 26. On February 4, 2022, the Court ruled on Defendants' 12(b)(6) motions, which helped define the scope of the case. Dkt. 127. To continue their efforts toward mediation, the Parties filed a joint request to stay the Action pending the Parties' settlement negotiations. Dkt. 129. The Court granted this request on February 25, 2022. Dkt. 130. On March 28, 2022, the Parties participated in a second mediation with Mr. Max, which was successful. Class Counsel Decl., ¶ 25.

On March 30, 2022, the Parties finalized and executed a Term Sheet, which represented an agreement in principle on the terms of the Settlement. *Id*. After reaching this agreement in principle, on June 15, 2022, the Parties finalized the terms of this Settlement Agreement and the exhibits attached hereto. *Id*.; *see also* Dkt. 146-1 ("Settlement Agreement" or "Settlement"), at 3.

### C.   SUMMARY OF PROPOSED SETTLEMENT AGREEMENT

The terms of the Parties' proposed Settlement Agreement are as follows:

#### 1.   The Settlement Class

The Settlement provides benefits to all members of the following Settlement Class: "the approximately 224,650 individuals who were mailed a notification that their personal information may have been impacted in the Data Security Incident experienced by Mediant on or around April 1, 2019," subject to certain exclusions. *See* Settlement Agreement, ¶ 26(dd).

### 2.      The Settlement Benefits

#### i.      Uncapped Cash Benefits

Following mailing of the notices, Settlement Class Members[2] had 90 days to file claims for two types of losses arising from the Data Security Incident: Out-of-Pocket Losses and Lost Time. *Id*. ¶¶ 27-28, 39(h). The cash funds available to pay these claims is uncapped, meaning that Settlement Class Members will be paid 100% of their losses subject to the individual caps set forth in the Settlement Agreement, without any risk of a reduction based on the number of claimants. This is a material benefit as Settlement Class Members were informed exactly what they were eligible to receive at the time they submitted a claim.

#### ii.      Reimbursement of Out-of-Pocket Losses

The first component of the Settlement is reimbursement of Out-of-Pocket Losses that are "fairly traceable[] to the Data Security Incident," of up to $10,000 per individual. *Id*. ¶ 27. Per the Settlement, an Out-of-Pocket Loss will be presumed to be "fairly traceable" to the Data Security Incident if "(1) the timing of the losses occurred on or after April 1, 2019 (or the earliest verifiable date of intrusion); and (2) the personal information used to commit identity theft or fraud consisted of the same type of personal information that was provided to Mediant prior to the Data Security Incident." *Id*. ¶ 53.

The Settlement reimburses Settlement Class Members for the following broad range of harms that are likely to flow from the Data Security Incident:

- Unreimbursed costs, expenses, losses, or other charges incurred as a result of fraud or identity theft, falsified tax returns, or other possible misuse of a Settlement Class Member's personal information;

---

[2] A "Settlement Class Member" is defined at paragraph 26(ee) of the Settlement to include "a Person who falls within the definition of the Settlement Class" and has neither properly excluded themselves from the Settlement Class nor been found guilty of aiding or abetting the Data Security Incident.

- Costs incurred on or after April 1, 2019 associated with freezing or unfreezing credit with any credit reporting agency;

- Miscellaneous expenses related to Out-of-Pocket Losses such as notary, fax, postage, copying, mileage, and long-distance telephone charges;

- Costs of credit monitoring or other mitigative costs that were incurred on or after April 1, 2019 and through the date of the Settlement Class Member's Claim submission;

- Documented time taken off work to address issues that are "fairly traceable" to the Data Security Incident, to be compensated at the Settlement Class Member's regular and documented hourly rate up to $250 per hour.

*Id.* ¶ 27.

### iii.     Reimbursement for Lost Time

The second component of the Settlement is reimbursement for time spent remedying issues related to the Data Security Incident. *See id.* ¶ 28. Settlement Class Members can make a claim for reimbursement for up to 8 hours of time spent at $20 per hour, with up to 3 hours requiring only a brief description of the time spent along with an attestation that the Settlement Class Member believes that the losses or expenses claimed were incurred as a result of the Data Security Incident, and an additional 5 hours with reasonable documentation of how the time was spent. *Id.* This is an important benefit as it permits Settlement Class Members to receive compensation for their valuable time and effort spent dealing with the Data Security Incident. In the event that a Settlement Class Member lost wages or other employment income addressing issues relating to the Data Security Incident, that time is treated as an Out-of-Pocket Loss and the Settlement Class Member can receive compensation at their regular documented hourly rate up to $250 per hour, subject only to the $10,000 individual cap.

### 3.     Claims Process

Submitting a claim for Out-of-Pocket Losses and Lost Time was not overly burdensome. Within 90 days of the Notice Date, a Settlement Class Member seeking reimbursement under these

provisions was required to submit a Claim Form to the Settlement Administrator, either electronically or by mail, to obtain recovery for any losses or expenses incurred as a result of the Data Security Incident. *Id.* ¶¶ 29, 39(h). And where supporting documentation was required, documents such as receipts from third parties or highlighted account statements were acceptable methods of supporting a Claim. *See* Declaration of Cameron R. Azari, Esq. on Implementation and Adequacy of Notice Plan and Notices ("Azari Decl.") at Attachment 4, page 3. The Settlement Administrator has discretion to determine whether a Settlement Class Member has adequately demonstrated a Claim, but must provide the Settlement Class Member with an opportunity to cure any deficiency. Settlement Agreement, ¶¶ 53-54. In accordance with that Settlement Agreement, the Settlement Administrator is currently in the process of reviewing and validating the Claims it has received, and is preparing to send formal Deficiency Notices to all Settlement Class Members with a deficient Claim. Azari Decl., ¶ 23. If the Settlement Administrator rejects a Claim for any reason, there is a simple appeal process whereby claimants can request an appeal to Class Counsel and Mediant's counsel. Settlement Agreement, ¶¶ 55-56.

### 4.     Three-Bureau Credit Monitoring Services

The Settlement also provides concrete benefits to Settlement Class Members concerned about future misuse of their compromised information. It made available to all Settlement Class Members two years of free three-bureau credit monitoring services. *Id.* ¶ 30.[3] Credit monitoring is a service that monitors an individual's credit reports and alerts the individual when any change is

---

[3] There are three major credit reporting agencies in the United States: Experian, Equifax and TransUnion. While many credit monitoring services only monitor an individual's credit activity with one agency, the more robust services such as the one offered to Settlement Class Members in the proposed Settlement monitor activity from all three major credit reporting agencies. Class Counsel Decl., ¶ 35. This is important because each agency operates independently from one another, and the information they receive from creditors can be different. As such, utilizing a credit monitoring services that monitors an individual's reports with all three agencies ensures that there are no gaps in coverage. *Id.*

made that could signal fraudulent activity, such as new credit card or loan applications, new credit inquiries, existing account changes, and new public records or address changes, among others. *See* Class Counsel Decl., ¶ 34. Credit monitoring gives the individual the opportunity to confirm the accuracy of a credit change in real time and, if necessary, address the issue before fraud occurs or expands. *Id.*

Accordingly, the Parties made available to all Settlement Class Members a robust monitoring service through Aura's Identity Defense Total Services ("Credit Monitoring Services"), which retails for approximately $15 per month. *Id.* ¶ 36. The Credit Monitoring Services were made available to all Settlement Class Members regardless of whether they submitted a claim for Out-of-Pocket Losses or Lost Time and include the following features:

- Three-bureau credit monitoring providing immediate notice of changes to the consumer's credit profile with Equifax, Experian, and TransUnion;

- Provides consumers with their credit scores on a monthly basis;

- Monitoring of high-risk transactions that include a consumer's personal information, such as payday loans, wire transfers, and account openings;

- Provides identity and authentication alerts to notify a consumer when their Social Security Number is used to verify an identity;

- Includes up to $1 million dollars reimbursement insurance covering losses due to identity theft or fraud;

- Provides access to Aura's team of fraud specialists, who can help a customer recover their identity and assets if they are a victim of identity theft; and

- Dark Web Monitoring providing notification if the consumer's information such as Social Security number, credit card numbers, financial account numbers, and health insurance number are found on the Dark Web.

*Id.* ¶ 35. This service was easily accessible, as following final approval of the Settlement, activation instructions will be sent to each of the more than 6,500 Settlement Class Members who provided

their email address and unique claim ID to the Settlement Administrator. Settlement Agreement, ¶ 30; Azari Decl. ¶ 23.

The Credit Monitoring Services provide significant value to the Settlement Class. While the Parties were able to secure discounted pricing based on the size of the Settlement Class, the actual market value of this settlement benefit can fairly be estimated at approximately $360 per Settlement Class Member ($15 per Settlement Class Member for 24 months). Class Counsel Decl., ¶ 36.

### 5.     Business Practice Changes

As an additional important benefit of the Settlement, Mediant has agreed to adopt and implement business practice changes to help protect the personal information in its possession. This will include security-system and practices enhancements described in Exhibit A to the Settlement Agreement, which was previously submitted to the Court under seal. Settlement Agreement, ¶ 31; Dkt. 152-1, at 36.

### 6.     Attorneys' Fees and Expenses and Service Awards

Pursuant to the Settlement, Mediant agreed not to object to Class Counsel's request for attorneys' fees and expenses of up to $700,000. Settlement Agreement, ¶ 59. The Settlement further authorized service awards for the three Class Representatives[4] in the amount of $2,500 each, in recognition of the time, effort, and expense they incurred in pursing claims that ultimately benefited the entire Settlement Class. *Id.* ¶ 60. Pursuant to the terms of the Settlement Agreement, on September 12, 2022, Class Counsel moved for an award of attorneys' fees and expenses of $700,000 and for service awards of $2,500 for each class representative. Dkts. 156-58.

Mediant will pay for these attorneys' fees, expenses, and service awards, as approved by

---

[4] Plaintiffs are referred to in the Settlement Agreement as the "Class Representatives." Dkt. No. 146-1, ¶ 26(i).

the Court, separate and apart from all other relief made available under the Settlement. Settlement Agreement, ¶¶ 61-62. As a result, the payment of attorneys' fees and service awards will not reduce any of the relief made available to Settlement Class Members, and they are intended to be considered separately from the fairness, reasonableness, and adequacy of the Settlement. *Id.* ¶ 62.

### 7.   **Expenses for Settlement Administration**

Mediant will also pay all costs of notice and administration of the Settlement, including the fees and expenses of the Settlement Administrator. *Id.* ¶ 57.

### 8.   **Proposed Releases**

In exchange for the benefits provided under the Settlement, Settlement Class Members will release "any and all claims and causes of action pleaded, that could have been pleaded, or otherwise arising out of or related to the activities stemming from the Data Security Incident or the Litigation." *Id.* ¶ 34. The Released Parties include Mediant, Donnelley, and the non-party investment funds, as set forth in the Agreement. *Id.* ¶¶ 26(aa), 34.[5]

### D.   PRELIMINARY APPROVAL AND ADMINISTRATION OF NOTICE

On June 17, 2022, Class Counsel filed an Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement Pursuant to Rule 23(e). Dkt. 145. The motion was granted on June 24, 2022, wherein the Court concluded it would likely approve the Settlement as fair, reasonable, and adequate and certify the Settlement Class for purposes of judgment on the

---

[5] As to the non-party investment funds, while Plaintiffs did not assert claims against them in this action, they allege that they could have done so, as Plaintiffs believe that any of their claims against the funds would have arisen out of the same factual predicate as the present Action: the Data Security Incident. Therefore, the investment funds may properly be released from liability through the Agreement. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 108–09 (2d Cir. 2005) ("The district court did not, therefore, err by finding that the non-party banks could be released from liability for conduct premised on the identical factual predicate of claims alleged in this action."); *see also In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262, 2002 WL 31663577, at *11 (S.D.N.Y. Nov. 26, 2002) ("[C]lass action settlements have in the past released claims against non-parties where, as here, the claims against the non-party being released were based on the same underlying factual predicate as the claims asserted against parties to the action being settled.")

proposal, and thus directed that notice be issued to the Class. Dkt. 153 ("Preliminary Approval" or "Order"), ¶¶ 6-15. In addition, for purposes of issuing notice of the Settlement, the Court appointed J. Austin Moore of Stueve Siegel Hanson, LLP, Elaine A. Ryan of Auer Ryan P.C., and John A. Yanchunis of Morgan & Morgan as interim class counsel pursuant to Rule 23(g)(3). *Id*. ¶ 16. The Court appointed Epiq Class Action and Claims Solutions, Inc. ("Epiq") to serve as the Settlement Administrator and to execute the Notice plan set forth in the Settlement Agreement. *Id*. ¶¶ 17-20.

In accordance with the Court's order, the Parties and Epiq commenced the approved notice program and claims process, as set forth in the Settlement Agreement. Mediant provided Epiq with records for 213,965 Settlement Class Members; 213,283 of those records were for unique individuals and included a physical mailing address. *See* Azari Decl., ¶ 10. After verifying these addresses against several databases, Epiq sent 213,283 Postcard Notices via USPS first class mail to all identified Settlement Class Members with an associated physical address.  *Id*. ¶ 11-12; *see also id*. at Attach. 2. If a Postcard Notice was returned as undeliverable, Epiq checked with USPS and a third-party lookup service for an alternate address, and re-mailed the Postcard Notice if one was identified. *Id*. ¶ 13. This process resulted in 4,977 re-mailed Postcard Notices. *Id*. Ultimately, a Postcard Notice was delivered to 209,422 of the 213,290 unique Settlement Class Members identified in Mediant's records. *Id*. ¶ 15. This means the individual notice efforts reached approximately 98.1% of the identifiable Settlement Class Members. *Id*.

The Postcard Notice concisely informed the Settlement Class Members of the Settlement Agreement and its terms, how to submit a claim for Lost Time and/or Expenses, how to claim access to the credit monitoring services, and the deadlines and processes by which to make a claim, object to, or request exclusion from the Settlement. *Id*. ¶ 11; *see also id*., Attach. 2. It also included

13

a detachable, postage prepaid form which a Settlement Class Member could return to request enrollment in two years of free Credit Monitoring Services without the need to submit a Claim. *Id.* ¶ 11.

The Postcard Notice directed Settlement Class Members to two resources regarding the Settlement: the Settlement Website and the Settlement Toll-Free Number. Via the Settlement Website (www.MediantSettlement.com), which received 12,457 unique visitor sessions, Settlement Class Members could directly submit a claim (including any required documentation) for Lost Time and/or Expenses and could submit their e-mail address to receive a link to activate access to Credit Monitoring. *Id.* ¶¶ 16-17. In addition to explaining a Settlement Class Member's legal rights and options and the deadlines by which to exercise them, the Settlement Website also included copies of key documents including the Long Form Notice, Claim Form, Settlement Agreement, Second Amended Complaint, Preliminary Approval Order, and Motion for Attorneys' Fees and Service Awards. *Id.* ¶ 16.

A section of the Settlement Website titled "Frequently Asked Questions" provided answers to over twenty-five different questions, including how to make a claim for benefits, how to object to or exclude oneself from the Settlement, and how Class Counsel would be paid. In response to the question about the lawyers' payment, the Website indicated that Class Counsel would be filing a motion for attorneys' fees and costs in an amount not to exceed $700,000 and for service awards of $2,500 to each of the Plaintiffs. The Long Form Notice, which was available on the Settlement Website and mailed directly to Settlement Class Members upon request, also provided this information about attorneys' fees and Plaintiffs' service awards. *See* Azari Decl., Attach. 3. As noted above, a copy of the Plaintiffs' Motion for Attorneys' Fees and Service Awards, which was filed on September 12, 2022, *see* Dkts. 156-58, was immediately made available on the website.

Finally, the Website included an email address at which to reach the Settlement Administrator, as well as the Settlement Toll-Free Number, where listeners could hear recorded answers to frequently asked questions. *Id*. ¶¶ 16, 18. The Toll-Free number received 347 calls, totaling about 981 minutes of use. *Id*. ¶ 19.

### E.   THE SETTLEMENT CLASS MEMBERS' FAVORABLE RESPONSE TO THE SETTLEMENT

The Settlement Class Members' response to the Settlement Agreement has been favorable. Only one Class Member has opted out of the Settlement, and there have been no objections. *Id*. ¶ 21; Attach. 5. The deadline to file a claim was November 21, 2022, and Epiq has received 6,519 requests for enrollment in Credit Monitoring Services and 1,147 Claim Forms for Lost Time and/or Expenses, totaling $870,257.33. *Id*. ¶ 23. Epiq is currently conducting a review and audit of all claims made, which may impact the final totals. *Id*.

## ARGUMENT

## I.   THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT

### A.   THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE PURSUANT TO THE RULE 23(E) AND SECOND CIRCUIT FACTORS.

A class action can only be settled with the court's approval. Fed. R. Civ. P. 23(e). If the proposal would "bind class members"—as it would here—the court must find that it is "fair, reasonable, and adequate" after considering whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). In addition to Rule 23(e)(2)'s enumerated factors, in evaluating a proposed settlement of a class action, courts in this Circuit consider the nine factors set forth in *City of Detroit v. Grinnell Corp*., 495 F.2d 488, 463 (2d Cir. 1974). *See, e.g.*, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019) ("The Court understands the new Rule 23(e) factors to add to, rather than displace, the *Grinnell* factors."). While the *Grinnell* factors substantially overlap with those in Rule 23(e)(2), the following factors "do not appear to be addressed by the Rule 23(e)(2) factors: the ability of the defendants to withstand a greater judgment; the range of reasonableness of the settlement fund in light of the best possible recovery; and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." *Id.* at 30, n.22. Plaintiffs thus address these factors separately at Sections III(B)(5-6), *infra*.

Within this framework, approval of a settlement is "within the Court's broad discretion." *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 423 (S.D.N.Y. 2001). "The compromise of complex litigation is encouraged by the courts and favored by public policy." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005) (citation and quotation marks omitted). After considering the relevant factors, this Court found in its Preliminary Approval Order that it was likely to approve the Settlement as fair, adequate, and reasonable. *See* Order, ¶¶ 6-12. The favorable response of the Settlement Class to the Settlement Agreement—with no objections, only one request for exclusion, and numerous claims for benefits—confirms that the

16

Settlement Agreement is fair, reasonable, and adequate that that this Court should grant final approval of it.

### 1. The Class Representatives and Class Counsel Have Provided Excellent Representation to the Class.[6]

To approve a settlement, Rule 23(e)(2)(A) requires a court to find that "the class representatives and class counsel have adequately represented the class." This analysis is an element of procedural fairness, and "'typically entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'" *In re GSE Bonds Antitrust Litig*., 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019) (quoting *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc*., 502 F.3d 91, 99 (2d Cir. 2007)) (cleaned up). In its Preliminary Approval Order, this Court had found that the Class Representatives and Class Counsel had adequately represented the class. Order, ¶ 7. This remains true.

First, the interests of the Class Representatives continue to be aligned with those of other Settlement Class Members, as they allege that they all suffered and seek to redress the same injury: the potential theft of their personal information in the April 2019 Data Security Incident. *See GSE Bonds Antitrust Litig*., 414 F. Supp. 3d at 692 ("plaintiffs' interests are aligned with other class members' interests because they suffered the same injuries—monetary losses resulting from GSE bond transactions.").

---

[6] This Rule 23(e) factor corresponds with *Grinnell's* procedural fairness factors considering whether "plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests." *In re AOL Time Warner S'holder Derivative Litig*., No. 02 Civ. 6302, 2006 WL 2572114, at *3 (S.D.N.Y. Sept. 6, 2006) (quoting *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)).

Next, as the Court noted, Class Counsel are highly experienced in complex class actions and data breach litigation in particular, having been appointed as lead or co-lead counsel in many of the largest data breach cases in history. *See* Order, ¶ 7; *see also* Class Counsel Decl., ¶¶ 3-11. This knowledge and experience enabled Class Counsel to efficiently prosecute the case and negotiate a well-informed settlement. *See In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000), *aff'd sub nom.*, *D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001) (proposed settlement enjoyed a "presumption of fairness" where class counsel were "extremely experienced in class action litigation" and were involved in "similar litigation in other Courts" involving the same subject matter). Further, prior to filing this case, Class Counsel conducted a thorough investigation of the potential claims, including researching Defendants' business practices and relationship, consulting with experts regarding the nature and scope of the Data Security Incident, and interviewing potential Settlement Class Members. *See* Class Counsel Decl., ¶ 13.

Due to their experience in litigating data breach cases, investigation of this case, and this Court's decision defining the legal contours of the Plaintiffs' negligence claim, Class Counsel gained insight into the facts and legal issues necessary to make an informed judgment concerning settlement. And while discovery in this action was stayed pending the motions to dismiss, the Parties engaged in jurisdictional discovery in a predecessor action that provided insight into the numbers of potentially affected individuals and the circumstances surrounding the Data Security Incident. Class Counsel has also taken discovery in numerous data breach cases, giving them insight into the types of evidence that would be available in this case. *Id.* ¶¶ 3-13. *See In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 458 (S.D.N.Y. 2004) ("Formal discovery is not a prerequisite; the question is whether the parties had adequate information about their claims."). As

the Court found in its Preliminary Approval Order, this factor therefore weighs in favor of approval. Order, ¶ 7.

**2.      The Settlement was Negotiated at Arm's Length.[7]**

Another element of procedural fairness, as required by Rule 23(e)(2)(B), is that "the proposal was negotiated at arm's length." A settlement "reached through arm's-length negotiations between experienced, capable counsel knowledgeable in complex class litigation . . . will enjoy a presumption of fairness." *See In re GSE Bonds Antitrust Litig*., 414 F. Supp. 3d at 693. As Class Counsel has attested, *see* Class Counsel Decl. ¶¶ 25-26, the negotiations leading to the present Settlement were hard fought over a number of years, arms-length, and involved the assistance of a mediator. *See In re GSE Bonds Antitrust Litig*., 414 F. Supp. 3d at 693 ("a mediator's involvement in settlement negotiations can help demonstrate their fairness."). Further, these negotiations were pursued by experienced counsel, Class Counsel Decl., ¶¶ 3-13, and only after vigorous adversarial litigation that spanned three years and several jurisdictions. Therefore, and as the Court found, the nature of the Parties' negotiations leading to the proposed Settlement weighs in favor of approval. *See* Order, ¶ 8.

**3.      The Relief Provided for the Class is Adequate.**

Taking into account the relevant factors, and as described below, the Settlement offers adequate relief to the Settlement Class Members. Indeed, this Court found in its Preliminary Approval Order that the offered relief was adequate, "taking into account the substantial risks of continued litigation, especially in data incident cases such as this one." Order, ¶ 9. The adequacy of the relief has now been confirmed by the Settlement Class Member's positive response to the

---

[7] This Rule 23(e) factor corresponds to the *Grinnell* procedural fairness factor considering whether "the settlement resulted from arm's-length negotiations." *In re AOL Time Warner S'holder Derivative Litig*., 2006 WL 2572114, at *3.

Settlement, with no class members objecting, only one class member opting out, and many Class Members claiming benefits under its terms. This response is a "major indication of fairness." *Flores v. CGI Inc*., 22-cv-350, 2022 WL 13804077, at *7 (S.D.N.Y. Oct. 21, 2022); *see also Wright v. Stern*, 553 F.Supp.2d 337, 345 (S.D.N.Y. 2008) ("The fact that the vast majority of class members neither objected nor opted out is a strong indication that the proposed settlement is fair, reasonable, and adequate.").

i.    the costs, risks, and delay of trial and appeal;[8]

In assessing the substantive adequacy of a proposed class settlement, Rule 23(e) requires a court to consider "the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C)(i). As explained in Plaintiffs' Motion for Preliminary Approval, Dkt. 146, at 20-21, the Parties have been vigorously litigating this case for three years, with Plaintiffs poised to file a Third Amended Complaint to address all pleading deficiencies identified by the Court. Indeed, the parties have briefed and argued substantial motions at every stage of the litigation arising from the Data Security Incident, including on personal jurisdiction, subject matter jurisdiction, and the adequacy of Plaintiffs' allegations. It is evident that further disputes lay ahead in this "inherently complex" class action, with risks to all parties. *In re Austrian and German Bank Holocaust Litig*., 80 F. Supp. 2d at 174.

This is especially true given that Mediant continues to deny all liability or any wrongdoing. Settlement Agreement, ¶ 25. And while Class Counsel is experienced in data breach cases and the

---

[8] This Rule 23(e)(2) factor "subsumes several *Grinnell* factors" going to the substantive fairness of the proposed settlement, "including (i) the complexity, expense and likely duration of the litigation, (ii) the risks of establishing liability, (iii) the risks of establishing damages, and (iv) the risks of maintaining the class through the trial. *See In re Payment Card Interchange Fee*, 330 F.R.D. at 36.

legal and factual issues that they present, it is still a relatively new and developing field of litigation, with particular uncertainty as it relates to class certification and trial. As this Court recognized, jurisprudence on data breach claims "has developed significantly in the last twelve years." *Toretto*, 2022 WL 348412, at *12. This evolution is certain to continue, with the Second Circuit having just recently provided guidance on the threshold Article III standing issues involved in data breach cases. *See McMorris v. Carlos Lopez & Assoc.*, 995 F.3d 295, 300 (2d Cir. 2021) (noting that it was addressing "whether a plaintiff may establish standing based on a risk of future identity theft or fraud" for the first time); *see also In re Equifax Inc. Customer Data Security Breach Litig.*, No. 1:17-md-2800, 2020 WL 256132, at *32 (N.D. Ga. Mar. 17, 2020), *aff'd in relevant part* 999 F.3d 1247 (11th Cir. 2021), *cert. denied sub nom. Huang v. Spector*, 142 S. Ct. 431 (2021), *and cert. denied sub nom. Watkins v. Spector*, No. 21-638, 2022 WL 89334 (U.S. Jan. 10, 2022) (noting that data breach plaintiffs' "path forward remained difficult," as "[t]he law in data breach litigation remains uncertain and the applicable legal principles have continued to evolve").

Further, Mediant has already raised questions about the Settlement Class Members' ability to demonstrate that they suffered damages, Dkt. 95, at 8-11, a question that is certain to recur throughout the course of the litigation. And there are risks, too, to obtaining and maintaining class certification through trial. *See, e.g.*, *Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 318 (N.D. Cal. 2018) ("While there is no obvious reason to treat certification in a data-breach case differently than certification in other types of cases, the dearth of precedent makes continued litigation more risky."). In sum, it is likely that if this litigation continues, there will be further substantive motions and appeals from both sides, thus increasing both the risks and costs for each party. *See, e.g.*, *Banyai v. Mazur*, No. 00 Civ. 9806, 2007 WL 927583, at *9 (S.D.N.Y. Mar. 27, 2007) ("[I]f

settlement has any purpose at all, it is to avoid a trial on the merits because of the uncertainty of the outcome.") (citation and quotation marks omitted).

And finally, the Data Security Incident occurred over three years ago. In addition to compensating Settlement Class Members for their Out-of-Pocket Losses and Lost Time, as this Court recognized, several provisions of the Settlement aim to protect the Settlement Class Members from the future risk of identity theft or fraud. *See* Order, ¶ 9. For example, the Settlement provides Settlement Class Members with access to Credit Monitoring Services specifically designed to detect or limit potential misuse of their information. 1,147 Settlement Class Members have claimed access to this benefit. Azari Decl., ¶ 23.

Mediant has also agreed, as part of this Settlement, that it has or will implement information security improvements. Settlement Agreement, ¶ 31. These benefits are more valuable to Settlement Class Members if implemented now—rather than being held up through the course of a protracted litigation among the parties—and are not otherwise available at trial. *See In re Marsh ERISA Litig.*, 265 F.R.D. 128, 139 (S.D.N.Y. 2010) (recognizing "immediacy and certainty" of recovery as potential benefit to proposed settlement class); *In re Equifax,* 2020 WL 256132, at *7 (benefits to class in data breach settlement, "including credit monitoring and injunctive relief," have "added value by being available now, rather than after years of continued litigation"); *In re Anthem,* 327 F.R.D. at 318 (noting that the "negative effects of delay are especially acute" in the data breach context, where "credit monitoring is most important for the five years following a data breach" and "it is imperative that [defendant] implement the security measures sooner rather than later.").

Thus, the proposed Settlement helps to "avoid[] the costs, delays and multitude of other problems associated" with this "inherently complex" class action. *In re Austrian and German Bank Holocaust Litig.*, 80 F. Supp. 2d at 174.

>    ii.    **the effectiveness of any proposed method of distributing relief to the class;**

Rule 23(e)(2)(C)(ii) requires a court to consider "the effectiveness" of the "proposed method of distributing relief to the class, including the method of processing class-member claims." The claims processing method "should deter or defeat unjustified claims" without being "unduly demanding." Advisory Committee Note to 2018 Amendment to Fed. R. Civ. P. 23. The Court recognized in its Preliminary Order that the claims process proposed in the Settlement Agreement met these requirements. Order, ¶ 10. Since that time, the Parties and Epiq have faithfully implemented the claims procedures set forth in the Settlement Agreement. *See* Azari Decl., ¶¶ 5-23. First, per the Court's Order, the Parties retained Epiq Class Action & Claims Solutions, Inc., an experienced and competent claims administrator familiar with handling data breach settlements. Dkt. 148, ¶¶ 1-8; *see also* Order, ¶ 17. The Settlement Class Members were identifiable from Mediant's records, and Notice of the proposed Settlement was directly mailed to each uniquely identifiable individual, reaching over 209,422 individuals in the Settlement Class. Azari Decl., ¶ 15; *see also* Order, ¶ 10.

Further, the Parties and Epiq fully implemented the consumer-friendly process for submitting a Claim that was set forth in the Settlement Agreement. Claims could be submitted either by mail or via the Settlement Website. Settlement Agreement, ¶¶ 39(c); *see also* Azari Decl., ¶¶ 22-23. And submitting claims was not overly burdensome. Settlement Class Members could claim a payment for three hours of time without submitting any documentation. Settlement Agreement, ¶ 28. Claims for Out-of-Pocket Losses and additional time could be supported by a

variety of documents, including receipts from third parties and highlighted account statements. *Id.* ¶¶ 27-28.[9] In fact, Settlement Class Members *successfully* availed themselves of this benefit, filing at least 1,147 Claims Forms with Epiq. Azari Decl., ¶ 23. Finally, Settlement Class Members had the opportunity to cure any deficiency identified by the Settlement Administrator, first through an informal process and then via a formal one—a process which is currently ongoing—and may appeal an ultimate rejection of a claim to Class Counsel and Mediant's counsel. Settlement Agreement, ¶¶ 54-56; Azari Decl., ¶ 23.

Further, access to Credit Monitoring Services was provided in a particularly accessible and convenient format: activation instructions will be sent via email to all Settlement Class Members who provided their email address and unique claim ID to the Settlement Administrator. Settlement Agreement, ¶ 30; *see also* Azari Decl., ¶¶ 11, 16; Order, ¶ 10. This service was made available to all Settlement Class Members, whether or not they submitted a Claim under the Settlement. Settlement Agreement, ¶ 30. Indeed, Epiq received 6,519 Credit Monitoring enrollment requests. Azari Decl., ¶ 23. And of course, Settlement Class Members will benefit from Mediant's information security improvements without needing to take any action. Therefore, the Parties and Epiq faithfully implemented and carried out the claims processes that this Court found would provide an "adequate and effective" method for distributing relief to the Settlement Class Members. Order, ¶ 10.

---

[9] Under the pre-2018-amendment factors developed by this Circuit, approval of the claims process also requires assessment of the allocation plan that it implements, which must be "fair and adequate" and have a "reasonable, rational basis," but "need not be perfect." *In re GSE Bonds Antitrust Litig.*, 414 F.Supp.3d at 694 (citations and quotation marks omitted). As funds from the settlement (which is uncapped) are allocated based on time Class Members spent addressing the data incident and their out-of-pocket expenses, the plan has a "rational, reasonable" basis for allocating funds.

### iii.    the terms of the proposed award of attorney's fees;

A court must consider "the terms of any proposed award of attorney's fees, including timing of payment" in assessing the fairness and adequacy of a proposed settlement. Fed. R. Civ. P. 23(e)(2)(C)(iii). This fee provision was negotiated after the Parties' counsel agreed upon the substantive material terms of the Settlement and does not diminish the total monetary relief available to the Settlement Class. Settlement Agreement, ¶¶ 58, 62; *see also* Class Counsel Decl., , ¶ 39. Further, the Settlement is not conditioned upon the Court's approval of the fee request and will become effective regardless of how that issue is decided. Settlement Agreement, ¶ 62. At the preliminary approval stage, this Court found that these terms were reasonable, subject to its review of a timely filed fee motion. Order, ¶ 11.

Pursuant to the terms of the Settlement and this Court's order, on September 12, 2022, Class Counsel moved the Court for $700,000 in combined fees and expenses. Dkts.156-58. As explained in their fee motion, Class Counsel have devoted more than 1,550 hours to litigating and resolving this action, resulting in a lodestar for their work of over $1.2 million. Dkt. 157, at 10-12. That number alone significantly exceeds the $700,000 that Class Counsel seeks, without accounting for the fact that that total amount is intended to compensate them for both their time *and* their costs and expenses, which they advanced in this litigation on an entirely contingent basis. *Id*. at 12-13. And Class Counsel's lodestar has only increased since they filed their fee motion, as they have continued to expend hours in monitoring and reviewing claims data provided by Epiq and in preparing this motion. This, along with an analysis of the factors set forth in *Goldberger v. Integrated Resources, Inc*., 209 F.3d 43, 47 (2d Cir. 2000) and described in Class Counsel's fee motion, demonstrates the reasonableness of Class Counsel's requested fees in this action. *See* Dkt. 157, at 8-20.

25

Per the terms of the Settlement Agreement, Plaintiffs also moved this Court for a service award of $2,500 each for the three Class Representatives in recognition of their time, effort, and risk in prosecuting this case on behalf of the Settlement Class Members. Settlement Agreement, ¶ 60; *see also* Dkt. 157, at 22-23. As with the attorneys' fees and expenses, the service awards were negotiated after the substantive terms of the Settlement, will be paid separately by Mediant, and the effectiveness of the Settlement is not tied to the Court's approval of this request. Settlement Agreement, ¶¶ 58, 62.

### iv.   and any agreement required to be identified under Rule 23(e)(3).

Rule 23(e) mandates that "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the proposal," and that the Court must then take into account any such agreements in assessing the relief provided in the settlement. *See* Fed. R. Civ. P. 23(e)(2)(iii), (3). There is no agreement between the parties, except as set forth in the Settlement Agreement. Class Counsel Decl., ¶ 26.

### 4.   The Settlement Treats Class Members Equitably Relative to Each Other.

The proposed Agreement treats all Settlement Class Members equitably relative to each other. Fed. R. Civ. P. 23(e)(2)(D). All Settlement Class Members have had the same opportunity to file a claim for Out-of-Pocket Losses and Lost Time, which means that monetary compensation will be apportioned in accordance with each Settlement Class Member's Claim. Further, because the funds available to pay claims is uncapped, no Settlement Class Member's recovery will be lessened because of another's recovery. This factor therefore weighs in favor of approval of the proposed Settlement Agreement.

5.      **The Ability of the Defendant to Withstand a Greater Judgment.**

In assessing the fairness and adequacy of a proposed settlement, courts in this Circuit also assess a defendant's ability to withstand a greater judgment. *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 696 (S.D.N.Y. 2019) (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 488, 463 (2d Cir. 1974)). Given that there are no aggregate caps on the amount of money Mediant is required to spend under the Settlement to compensate Out-of-Pocket-Losses and Lost Time, and the Settlement provides for additional relief that would not otherwise be available at trial, this factor weighs in favor of settlement approval. *See, e.g., In re GSE Bonds Antitrust Litig.*, 414 F.Supp.3d at 696 (noting that "a defendant's cooperation 'tends to offset the fact that they would be able to withstand a larger judgment'") (quoting *In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F.Supp.2d 697, 702 (M.D. Pa. 2008)). And even if Mediant could withstand a greater judgment, this factor alone would not weigh against settlement. *See, e.g.*, *Viafara v. MCIZ Corp.*, No. 12 Civ. 7452, 2014 WL 1777438, at *7 (S.D.N.Y. May 1, 2014) ("'defendant's ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair'") (citation omitted). Thus, as this Court found at the preliminary approval stage, this factor weighs in favor of approval. Order, ¶ 12.

6.      **Recovery Under the Settlement Is Within a Reasonable Range in Light of the Best Possible Recovery and All the Attendant Risks of Litigation.**

Finally, courts in this Circuit consider two related factors: "the range of reasonableness of the settlement" in light of (1) "the best possible recovery" and (2) "all the attendant risks of litigation." *In re GSE Bonds Litig.*, 414 F. Supp. 3d at 696 (citing *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 330 F.R.D. 11, 47-48 (E.D.N.Y. 2019)). Assessing these factors requires taking into account "the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion."

*Viafara*, 2014 WL 1777438, at *7 (citation and quotation marks omitted). This Court found at the preliminary approval stage that the Settlement offered recovery that was "within a reasonable range in light of the best possible recovery and all the attendant risks of litigation," Order, ¶ 12, and that remains true.

First, as to the best possible recovery available to Plaintiffs, this Court has recognized that "costs incurred to mitigate" the future risk of "identity theft or fraud" are potentially compensable damages in a data breach case. *See Toretto*, 2022 WL 348412, at *14. Here, the Settlement compensates Settlement Class Members for these claimed losses, reimbursing them for lost time and expenses in response to both realized and potential future harm from the Data Security Incident. Settlement Agreement, ¶¶ 27-28. And in fact, 1,147 Settlement Class Members have made claims for these types of losses totaling $870,257.33. Azari Decl., ¶ 23.

Further, the Settlement provides two types of benefits that would not be available to Settlement Class Members as traditional damages through the litigation process. First, it offers them access to high-quality credit monitoring—a benefit claimed by 6,519 Settlement Class Members (Azari Decl. ¶ 23)—and which courts often value at their retail price. *See Equifax*, 2020 WL 256132, at *17, 38 (noting that Court had "repeatedly lauded high-quality credit monitoring services as providing valuable class-member relief that would likely not otherwise be recoverable at trial," and recognizing that "the high-quality credit monitoring offered here is more valuable than the free or low-cost services typically available"); *In re Anthem*, 327 F.R.D. at 323 ("Obviously, the credit monitoring services themselves confer an economic benefit, as they can retail for $9 to $20 a month."). Settlement Class Members need not have taken any steps to mitigate the potential harm from the Data Security Incident to access this benefit.

And second, the Settlement provides prospective relief beyond what would be available through litigation, in the form of improvements to Mediant's information security practices. *See, e.g.*, *Charron v. Pinnacle Group N.Y. LLC*, 874 F. Supp. 2d 179, 202 (S.D.N.Y. 2012) (noting that neither "Best Practices" nor "injunctive relief that are designed to alter how Pinnacle deals with its tenants on a going-forward basis . . . would be available to Class Members in any context outside of the Settlement—whether if the Class were decertified and they were forced to start from scratch, or if the liability claims . . . went to trial."); *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 972, 974 n.6 (8th Cir. 2018) (in data breach case "the injunctive relief offered under the settlement" – which included defendant's commitment to implement "a number of data-security measures" – "has value to all class members"). In light of the uncertainties involved in litigating these still-novel claims, as well as the potential difficulties in maintaining class certification and proving damages, *see supra* Section III(B)(3)(i), the Settlement is well within a reasonable range. *In re Facebook, Inc., IPO Sec. and Derivative Litig.*, 343 F. Supp. 3d 394, 414 (S.D.N.Y. 2018), *aff'd*, 822 F.App'x 40 (2d Cir. 2020) (although "particularized evidence ha[d] not been adduced to support a 'best possible' judgment, the agreed-upon figure [was] reasonable in light of the substantial risks to recovery.").

\* \* \*

Thus, analysis of Rule 23(e)(2)'s enumerated factors and the additional *Grinnell* factors considered by the Second Circuit demonstrate that the Settlement is fair, reasonable, and adequate. Further, the Settlement Class Members' favorable response to the Settlement—with no objections, only one opt-out, and numerous claims for benefits—confirms its fairness and adequacy. *See Wright v. Stern*, 553 F.Supp.2d 337, 345 (S.D.N.Y. 2008) ("The fact that the vast majority of class members neither objected nor opted out is a strong indication that the proposed settlement is fair,

reasonable, and adequate."); *RMED Intern., Inc., v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587, 2003 WL 21136726, at *1 (S.D.N.Y. May 15, 2003) ("The lack of class member objections to the settlement is certainly noteworthy. In fact, 'the absence of objectants may itself be taken as evidencing the fairness of a settlement.'") (quoting *Ross v. A.H. Robins*, 700 F.Supp. 682, 684 (S.D.N.Y. 1988)).

## II.   THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS FOR PURPOSES OF JUDGMENT

In its Preliminary Approval Order, this Court indicated that it would likely certify the Settlement Class for purposes of judgment on the proposal, defining the Class as:

> The approximately 224,650 individuals who were mailed a notification that their personal information may have been impacted in the Data Security Incident experienced by Mediant on or around April 1, 2019.

Order, at ¶¶ 13-14. As this Settlement Class continues to satisfy the requirements of Rule 23(a) and (b) and thus remains appropriate for class treatment, Plaintiffs respectfully request that the Court now certify it for purposes of judgment on the proposal. *See In re Am. Int'l Group, Inc. Sec. Litig.*, 689 F.3d 229, 238 (2d Cir. 2012).

As Plaintiffs noted in their Motion for Preliminary Approval, courts have routinely certified Settlement Classes in data breach cases, which are particularly well-suited to class-wide resolution. *See, e.g.*, *Abubaker v. Dominion Dental USA, Inc.*, No. 1:19-cv-01050, 2021 WL 6750844, at *2-4 (E.D. Va. Nov. 19, 2021); *In Re: Equifax Customer Data Security Breach Litig.*, MDL No. 2800, 2020 WL 256132, at *11-14 (N.D.Ga. Mar. 17, 2020); *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, No. 1:16-c-03025, 2019 WL 3183651, at *3-4 (D. Md. July 15, 2019); *Anthem*, 327 F.R.D. at 306-16; *In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 14-md-02583, 2016 WL 6902351, at *1-3 (N.D. Ga. Aug. 23, 2016). This is because in data breach cases, an identifiable group of people suffered the same injury—the theft or compromise of their personal

information—arising out of the same incident. So too here. As the proposed Settlement Class readily meets the requirements of Federal Rules of Civil Procedure 23(a) and (b)(3), this Court should certify it for purposes of judgment.

A.    THE RULE 23(A) REQUIREMENTS ARE SATISFIED.

*Numerosity:* The proposed Settlement Class consists of more than 224,000 geographically dispersed individuals, rendering individual joinder impracticable. *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 138 (S.D.N.Y. 2019) ("'Numerosity is presumed for classes larger than forty members.'") (quoting *Pennsylvania v. Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014)). In addition to the sheer number of individuals in the Settlement Class, certifying a class is also superior to joinder because the low-dollar amount of the claims, along with other barriers to a potential recovery, *see* section III(A)(3), *supra*, would make it difficult and inefficient for individuals to sue separately. *See In re SunEdison*, 329 F.R.D. at 138 ("[T]he numerosity inquiry is not strictly mathematical but must take into account the context of the particular case, in particular whether a class is superior to joinder based on other relevant factors.") (quoting *Pennsylvania*, 772 F.3d at 120)). And finally, the geographic dispersion of the Settlement Class Members – who are located throughout the country, in every state and Puerto Rico – is yet another reason joinder would be impracticable. *See In re SunEdison*, 329 F.R.D. 329 at 138 ("geographic dispersion" a relevant factor in assessing whether class action is superior to joinder). As the Court found in its Preliminary Approval Order, the Class is therefore "sufficiently numerous." Order, ¶ 13(a).

*Commonality:* "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury" such that their claims "can productively be litigated at once." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-350 (2011) (internal citations omitted). As this Court recognized, Order ¶ 13(b), the Settlement Class Members' claims share a common factual core, as

they each suffered the same alleged injury—potential theft of their personal data in the Data Security Incident. The key legal questions are common, too: Did Mediant owe the putative Class Members a duty to safeguard their personal information, and if so, were its cybersecurity measures sufficient to satisfy that duty?

As answering these questions "will resolve [] issue[s] that [are] central to the validity of each one of the claims in one stroke," *id.* at 350, commonality is satisfied. *See also Dominion*, 2021 WL 6750844, at *3 (identifying common questions in data breach case); *Equifax*, 2020 WL 256132, at *11-12 (noting that courts have found commonality requirement "readily satisfied" in the "context of data breach class actions"); *Anthem*, 327 F.R.D. at 308 (data breach "complaint contains a common contention capable of class-wide resolution—'one type of injury allegedly inflicted by one actor in violation of one legal norm'") (quoting *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1154 (9th Cir. 2016)).

***Typicality:*** To ensure that the Class Representatives "have the incentive to prove all the elements of the cause of action" that would otherwise have been individually brought by class members, Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *In re Oxford Health Plans*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000).

Here, the Class Representatives' litigation goals precisely align with those of the Settlement Class Members, as their claims arise from the same Data Security Incident and involve the same negligence theory as all other Settlement Class Members. *See Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) ("Typicality . . . 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'") (citation omitted); *Dominion*, 2021 WL 6750844, at *3 (typicality

satisfied where "[l]ike the Representative Plaintiffs, other Settlement Class members were subject to the alleged data breach and have suffered the same types of injuries."); *Home Depot Inc.*, 2016 WL 6902351, at *2 (typicality satisfied where plaintiffs' claims "arise from the same data breach and Home Depot's conduct in connection with the data breach").

In other words, the Class Representatives are motivated to prove the same facts and legal theories as those they represent, and typicality is therefore satisfied. *See* Order, ¶ 13(c).

*Adequacy of Representation:* "The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997). As this Court previously noted, *see* Order, ¶ 13(e), no such conflict of interest exists or will arise in this case, as the Class Representatives and the proposed Settlement Class Members allege that they all had their personal information compromised through the same Data Security Incident and all seek to remedy similar injuries. *See, e.g.*, *In re Equifax Inc. Customer Data Sec. Litig.*, 999 F.3d 1247, 1276 (11th Cir. 2021) (adequacy in data breach case satisfied as plaintiffs' claims "arise out of the same unifying event . . . seek redress for the same injury . . . and seek compensation for injuries associated with the risk of identity theft"); *Anthem*, 327 F.R.D. at 309-10 (adequacy satisfied as "all Settlement Class Members are victims of the same event" and "seek the same relief: compensation for the harms already incurred as a result of the breach and protection against the use of their personal information going forward").

Further, as this Court recognized, *see* Order, ¶ 13(e), *supra* Section III(A)(1), the Class Representatives have retained lawyers who are eminently qualified and experienced in both class action and data breach litigation. *See In re Oxford Health Plans*, 191 F.R.D. at 376 (noting that adequacy requirement is also concerned with whether "counsel for Plaintiffs is qualified and capable in this type of litigation."). The adequacy requirement is thus satisfied. *See* Order, ¶ 13(e).

### B.   THE RULE 23(B)(3) REQUIREMENTS ARE SATISFIED.

Parties seeking class certification must also show that the action satisfies at least one subsection of Rule 23(b). Here, the proposed Settlement Class satisfies Rule 23(b)(3)'s requirements that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that class treatment is "superior to other available methods for fairly and efficiently adjudicating the controversy."[10]

*Predominance:* Common questions predominate if the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. This requirement is satisfied "if resolution of some of the legal or factual questions . . . can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

As this Court found, "common issues of law and fact predominate over any questions affecting any individual in the Settlement Class." Order, ¶ 13(b).  Indeed, Plaintiffs allege that the key questions in this case are whether Mediant had a duty to secure its customers' personal data, and whether it took reasonable steps to do so. And as all Settlement Class Members assert that they face a substantial risk of harm from the same Data Security Incident, this question can be resolved by consideration of the same evidence as to Mediant's cybersecurity practices and e-mail servers. *See, e.g.*, *Dominion*, 2021 WL 6750844, at \*3 (the "many common issues of fact and law that arise from the alleged data breach and Defendants' alleged conduct predominate over any individualized issues"); *Equifax*, 2020 WL 256132, at \*13 (predominance satisfied in data breach case as "all

---

[10] A settlement-only class need not meet one requirement of Rule 23: "[B]ecause the case will never go to trial, the court need not consider the manageability of the proceedings should the case or cases proceed to trial." *In re Initial Public Offering Sec. Litig.*, 260 F.R.D. 81, 88 (S.D.N.Y. 2009).

claims arise out of a common course of conduct by Equifax."). Indeed, the question of whether a defendant took reasonable measures to secure customers' personal data "is the precise type of predominant question that makes class-wide adjudication worthwhile." *Anthem*, 327 F.R.D. at 312. And finally, as this Court has previously found that New York law applies to the negligence claims against Mediant, *Toretto*, 2022 WL 348412, at *8, there is no concern that any "variations in state law will [] predominate over the common questions." *Equifax*, 2020 WL 256132, at *13.

    *Superiority:* "[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy . . . ." 7AA Charles Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1779 (3d ed. 2005). That is the case here. Order, ¶ 13(e). Individually litigating the low-dollar-value claims of over 224,000 people dispersed throughout the country, all arising out of the same Data Security Incident, would be uneconomical and inefficient for both the Settlement Class Members and the courts. The superiority requirement is thus satisfied. *See In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 702 (S.D.N.Y. 2019) ("large size of the class and potentially small recovery of many individual plaintiffs suggests that class members' interests are likely served by a class action"); *Equifax*, 2020 WL 256132, at *14; *Anthem*, 327 F.R.D. at 315-16.

## CONCLUSION

    For the reasons set forth set forth above, and as set forth in their Proposed Order, Plaintiffs request that the Court (1) grant final approval of the Settlement as fair, reasonable, and adequate under Rule 23(e)(2); (2) certify the Settlement Class for purposes of judgment on the proposal; (3) grant Class Counsel's Unopposed Motion for an Award of Attorneys' Fees and Expenses and for Plaintiff Service Awards and (4) enter final judgment after the Final Approval Hearing.

Dated: December 22, 2022

/s/ *J. Austin Moore*
Norman E. Siegel (*pro hac vice*)
J. Austin Moore (*pro hac vice* )
Lindsay Todd Perkins (*pro hac vice*)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
siegel@stuevesiegel.com
moore@stuevesiegel.com
perkins@stuevesiegel.com

John A. Yanchunis (*pro hac vice*)
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Tel.: 813-223-5505
jyanchunis@forthepeople.com

Elaine A. Ryan (*pro hac vice*)
**AUER RYAN PC**
20987 N. John Wayne Parkway, B104-374
Maricopa, AZ 85139
Tel: 520-705-7332
eryan@auer-ryan.com

*Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered users.

*/s/ J. Austin Moore*

36